# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 16, 2018
NOT TO BE PUBLISHED

**Supreme Court of Kentucky**

2017-SC-000044-MR

ROGER DALE EPPERSON        APPELLANT

ON APPEAL FROM WARREN CIRCUIT COURT
V.      HONORABLE STEVE ALAN WILSON, JUDGE
NO. 97-CR-000016

COMMONWEALTH OF KENTUCKY        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

In 2003, a Warren County jury convicted Roger Dale Epperson of two counts of complicity to commit murder, first-degree robbery, and first-degree burglary. The jury sentenced him to death. Following an unsuccessful direct appeal,[1] Epperson moved to set aside his convictions and sentence pursuant to RCr[2] 11.42, which the trial court denied after conducting evidentiary hearings. Epperson now appeals. Upon thorough review of the record and careful consideration of his claims, we affirm.

---

[1] *Epperson v. Commonwealth*, 197 S.W.3d 46 (Ky. 2006).

[2] Kentucky Rules of Criminal Procedure.

# I. BACKGROUND.

Epperson was first tried in 1987 for the murder, robbery and burglary of the victims in this case, both of whom were found dead in their home on June 17, 1985. One victim had two gunshot wounds in the back. The other had two gunshot wounds to the head and was also gagged. In that first trial, a jury convicted Epperson of robbery, burglary, and murder and sentenced him to death. However, those convictions were ultimately set aside by this Court on appeal because the trial court did not conduct individual voir dire on the issue of pretrial publicity. On retrial, a jury convicted Epperson of complicity to commit murder, robbery and burglary and sentenced him to death. On direct appeal, this Court affirmed.

Epperson then filed the underlying RCr 11.42 motion, alleging numerous violations of his constitutional right to effective assistance of counsel. Evidentiary hearings began in 2010 and concluded in 2014. The trial court ultimately determined that all claims of error were unfounded and denied his motion for relief. Epperson now appeals as a matter of right.

# II. STANDARD OF REVIEW.

As the movant, Epperson bears the burden of establishing ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To be ineffective, performance of counsel must fall below the objective standard of reasonableness and be so prejudicial as to deprive a defendant of a fair trial and a reasonable result. *Id.* This analysis involves mixed questions of law and fact. While we will not disturb the

2

trial court's factual findings if they are supported by substantial evidence, we review its conclusions of law de novo. *Brown v. Commonwealth,* 253 S.W.3d 490, 500 (Ky. 2008). "When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

### III.   ANALYSIS.

#### A. Juror Issues.

Epperson argued that trial counsel was ineffective for failing to ask more probing questions of the jurors during voir dire regarding whether they could consider mitigating evidence. He claimed that his counsel's "boiler plate" voir dire, in which counsel asked jurors whether they could consider mitigating evidence, was insufficient to elicit deficiencies or juror bias that would have allowed jurors to be struck for cause. During the RCr 11.42 evidentiary hearing, Epperson attempted to introduce evidence, in the form of post-verdict affidavits, from jurors who sat on his jury panel, which he argued showed that they answered voir dire questions incompetently or untruthfully, thus masking their inability to meaningfully consider the full range of penalties and making them unfit to serve as jurors.

As an initial matter, post-verdict juror affidavits obtained ex parte generally do not support any valid basis for an RCr 11.42 motion because such evidence is generally incompetent under rules prohibiting jurors from being examined to establish grounds for a new trial. *See* RCr 10.04; *Haight v. Commonwealth*, 41 S.W.3d 436, 447 (Ky. 2001), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009); *but see Brown v. Commonwealth*, 174 S.W.3d 421 (Ky. 2005) (considering affidavit of juror in attempting to ascertain whether juror failed to answer honestly a material question on voir dire); *Bowling v. Commonwealth*, 168 S.W.3d 2 (Ky. 2004) (considering affidavit of juror in attempting to ascertain whether juror failed to answer honestly a material question on voir dire); *Taylor v. Commonwealth*, 175 S.W.3d 68 (Ky. 2005) ("[A] defendant is free to establish that a juror did not truthfully answer on voir dire....Taylor is correct that he may challenge the juror's answers at voir dire with her testimony given during the post-conviction hearing."); *Pena-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017) (juror affidavit used to show racial animus during jury deliberations). To prove juror mendacity and gain a new trial, "a party must demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Adkins v. Commonwealth*, 96 S.W.3d 779, 796 (Ky. 2003) (internal quotations and citation omitted).

The trial court rejected Epperson's claim, noting that voir dire is an inherently strategic part of trial, if not the most strategic part. As a matter of

4

strategy, the court questioned what could have possibly been achieved by trial counsel questioning the jurors about specific mitigating evidence that had not yet been presented; indeed, the strategy of making excuses for murder at the outset of trial is questionable. Moreover, without any evidence having been presented yet, and no clue as to each party's theory of the case, a reasonable juror might question the relevance of such specific questions concerning mitigating evidence. As the trial court observed, the questions an attorney chooses not to ask during voir dire are just as important as the questions he does ask. During the evidentiary hearing, Epperson's lead trial counsel was not asked about his voir dire strategy. Second chair counsel could recall very few specifics from the trial but testified generally that adequate voir dire was necessary and appropriate and that a juror's ability to consider mitigating evidence would be important.

During the evidentiary hearing, three jurors testified. Specific questions were posed to them regarding what evidence they would have considered in mitigation. They indicated that evidence of head injuries, child abuse, good behavior in prison and military service would not have affected their decision to impose the death penalty in Epperson's case, but all stated that they would have considered it while deliberating. The jurors further testified that they followed the instructions provided to them by the court and considered all evidence presented to them. Each stated they were able to consider the full range of possible penalties and had answered all voir dire questions honestly

5

and to the best of their ability. Each avowed that the penalty imposed would depend on the specific facts of the case before them.

With respect to their affidavits, the jurors testified that Epperson's post-conviction counsel had appeared on their doorsteps unannounced, years after the trial, asking them questions about their thoughts on mitigation, and executing an affidavit which the jurors signed. With respect to this approach taken by post-conviction counsel, we take the liberty of quoting the trial court's findings on this issue, as we could not have said it any better:

> For years, Epperson's post-conviction counsel has called these jurors, shown up at their house to conduct interviews, and subpoenaed them into this court for further proceedings. Counsel has done this for the sole purpose of attacking the effectiveness of Epperson's trial attorneys, not to allege wrongdoing or misconduct by the jurors themselves. This court can state, without hesitancy, the rationale of the *Maras [v. Commonwealth*, 470 S.W.3d 332 (Ky. 2015)] court is sound. This court believes these jurors did say, and would have said, whatever needed to be said just for Epperson's post-conviction attorneys and investigators to stop questioning them. One juror expressed his dissatisfaction with the court system as a whole, stated he lacked confidence that the difficult decision he faced will be honored, and swore he would never participate on another jury. The constant disruption of fellow citizens' lives, who are ordered into court to perform their civic duty for a mere $12.50 per day, serves only to poison the confidence our society has in its participation in criminal justice matters. This court does respect the decision this jury rendered and understands that asking someone to consider taking human life is a decision carefully measured – by most. It was proper to try those who extrajudicially sentenced and executed [the victims]; it was improper to try the jurors who judicially sentenced Epperson to a similar fate.

The trial court found that none of the post-verdict juror affidavits should have been admitted and declined to consider them. In so ruling, the court noted that "[a] juror cannot be examined to establish ground for a new trial,

6

except to establish that the verdict was made by lot." RCr 10.04. The trial court relied on this Court's recent decision in *Maras*, wherein we clarified that in limited circumstances, the rule set forth in RCr 10.04 must yield to constitutional demands. However, those limited circumstances "can be summed up rather simply: juror testimony is permitted when it 'concern[s] any overt acts of misconduct by which extraneous and potentially prejudicial information is presented to the jury[.]'" *Maras*, 470 S.W.3d at 335 (quoting *Commonwealth v. Abnee*, 375 S.W.3d 49, 54 (Ky. 2012)).

Here, Epperson did not allege that "any overt acts of misconduct by which extraneous and potentially prejudicial information" occurred with this jury. Epperson has not demonstrated that any of these three jurors failed to answer honestly a material question posed during voir dire, thus we need not address whether a correct answer would have served as a basis for a challenge for cause. As we stated in *Maras*, "[w]ithout more, *e.g.,* indication of overt influence, a facially valid jury verdict will not be upset based on post-trial juror statements." 470 S.W.3d at 337. Epperson has further failed to present any evidence to overcome the presumption that trial counsel's approach to voir dire was a result of trial strategy. We agree with the trial court that Epperson's claimed errors with respect to voir dire and juror misconduct are wholly unsupported.

## B. Guilt Phase Issues.

Epperson asserted that trial counsel was ineffective during the guilt phase of his trial by failing to investigate and present evidence of alternative suspects, by presenting inconsistent defenses, and by failing to impeach co-defendant Donald Bartley. We disagree.

### i. *Alternative Suspects.*

Epperson argued that trial counsel was ineffective for failing to investigate whom he termed "alternative suspects." In support, he pointed to the police reports in this investigation which referred to other persons who were investigated for these crimes but ultimately not charged. This police investigation, which was ongoing for a year before Epperson and his co-defendants were arrested, documented certain individuals' claims that people other than Epperson had committed the crimes. For instance, one police report documented a statement made by a confidential informant that certain individuals (other than Epperson) would regularly come to his house and ask about developments in this case. Notably, that police report also expressed concern about the reliability of this information. Another police report documented that an individual told detectives that two young boys had been bragging about having committed the murders.

At trial, the jury was informed that this case had been under investigation for more than a year before Epperson and his co-defendants were arrested. The jury was also advised that Epperson's arrest was made only after

8

co-defendant Donald Bartley confessed to the murders, implicating Epperson and defendant Hodge. No "alternative suspects" testified in any proceeding.

Epperson maintained that trial counsel's failure to investigate "alternative suspects" undermined the innocence defense that counsel presented. At the evidentiary hearing, Epperson's lead counsel was not asked about any investigation of alternative suspects. Second chair counsel was questioned and testified that he recalled reviewing police reports involving other suspects but did not recall conducting an independent investigation into other suspects. He conceded that any other alternatives to Epperson's involvement would have been important.

This Court has held that the failure to investigate a defense and present crucial witnesses to the defense may constitute ineffective assistance of counsel. *Commonwealth v. Bussell,* 226 S.W.3d 96, 106 (Ky. 2007). The movant must show: (1) a reasonable investigation would have uncovered the defense; (2) the failure to present a defense was not a tactical decision by trial counsel; and (3) there is a reasonable probability that, but for counsel's failures, the result would have been different. *Id.* "If the decision was tactical, it is given a strong presumption of correctness, and the inquiry is generally at an end." *Id.* (internal quotations omitted). "On review, as a court far removed from the passion and grit of the courtroom, we must be especially careful not to second-guess or condemn in hindsight the decision of defense counsel. A defense attorney must enjoy great discretion in trying a case, especially

regarding trial strategy and tactics." *Harper v. Commonwealth,* 978 S.W.2d 311, 317 (Ky. 1998).

Here, the information documented in the police reports regarding "alternative suspects" was insufficient to warrant arresting any of those individuals during the year-long investigation of these crimes. Epperson has not shown that these individuals would have testified that he was not guilty, or otherwise would have corroborated his defense. The trial court held that given the limited potential exculpatory value of these individuals as witnesses, the decision of trial counsel not to pursue an independent investigation into these leads was not objectively unreasonable. Further, even if the failure to investigate these alleged suspects was objectively unreasonable, the trial court was unconvinced that a reasonable probability exists that the outcome of Epperson's trial would have been different, especially given that the evidence against these individuals was not strong enough to merit any arrests. We agree with the trial court that this claim of error does not merit RCr 11.42 relief.

### ii. Inconsistent Defense.

Epperson asserted that trial counsel was ineffective for presenting two mutually exclusive defenses, thus destroying the credibility of either. Epperson was charged with both murder and complicity to commit murder, as well as robbery and burglary. He argued that trial counsel's position that he did not know the victims, and concession that Epperson might have been the get-away driver because he did not want to be recognized by the victims, was mutually

10

exclusive and prevented the jury from returning a not guilty verdict on the murder charges. However, as the trial court noted, suggesting that Epperson did not want to be recognized does not concede that he knew the victims. He could have been complicit in the robbery and burglary and feared being seen and described by the victims later. That would indicate that Epperson believed the victims would survive, and perhaps the jury could have been persuaded that murder was never part of his plan.

Further, as the trial court noted, the Commonwealth presented substantial evidence that robbery and burglary were indeed Epperson's main objectives. Thus, Epperson's defense was not objectively unreasonable or inconsistent: deny all involvement, but if involved, deny involvement in the murders. In fact, as the trial court pointed out, this defense strategy likely built credibility with the jury and succeeded to some measure. Epperson was indicted for, among other things, two counts of murder. The jury disregarded the Commonwealth's theory of the case and found him guilty of complicity to commit murder, effectively finding that he was not the principal actor. In terms of trial strategy, the trial court observed:

> Admitting involvement in the robbery and burglary does not concede an agreement to commit murder, and trial counsel's choice to build some credibility with the jurors in order to spare Epperson's life at a later point could have been an effective strategic decision. However, this trial strategy must also be considered in light of the fact that Epperson had already been incarcerated for thirteen years at the time of his second trial in 2003. Thus, if the jury convicted him only on the robbery and burglary charges, the minimum sentence could have been two 20-year sentences served concurrently. Epperson, being eligible for parole after serving 85% of the sentence, could have potentially served out his sentence after an additional four years. It was not

11

unreasonable to strategically concede involvement in the robbery and burglary once the Commonwealth presented its case in chief.

Considering the foregoing, we believe the trial court properly concluded that Epperson had failed to meet his burden of proving that trial counsel presented an inadequate defense to the charges to merit RCr 11.42 relief.

### iii. Impeachment of Co-defendant Bartley.

Epperson asserted that trial counsel was ineffective for failing to impeach co-defendant Bartley, who implicated him in the murders. Epperson argued that trial counsel should have followed up on Bartley's alleged false statement regarding the sentence he received in return for his testimony at Epperson's trial, and should have confronted Bartley with respect to his inconsistent confessions, including one in which Bartley allegedly stated that he had framed Epperson to save his own life. These general allegations are set forth in only three sentences of Epperson's appellate brief, and he failed to elaborate or identify any resulting prejudice. Accordingly, we will only address these claims to the extent he raised them in this Court. We decline to address any other claims not expressly raised before this Court.

Epperson alleged that Bartley falsely told the jury that he had received a sentence of life with parole eligibility in 25 years in exchange for his testimony in this case, when he received a 45-year sentence. The record shows that Bartley did receive a 45-year sentence for his involvement. However, as the trial court noted, the relevant take away for the jury was that Bartley essentially agreed to spend the rest of his life in prison in exchange for his testimony in Epperson's case, and that point was made clear to the jury. The

12

court concluded that counsel's decision not to obtain the judgment imposing sentence upon Bartley to impeach him with respect to this distinction was not objectively unreasonable. And even if it was, no reasonable probability exists that the difference between a 25-year sentence and 45-year sentence for Bartley would have affected the jury's verdict on Epperson's guilt. We agree.

**C. DNA Issues.**

Ed Taylor, a serologist at the Kentucky State Crime Lab, testified at Epperson's first trial that no physical evidence linked Epperson to the crime scene. Nevertheless, the jury still returned a verdict of guilty and a sentence of death. Thereafter, but prior to Epperson's retrial, at Epperson's request, his DNA was tested along with 2 hairs retrieved from the victims' bodies. Taylor analyzed the test results, which indicated that one hair was not testable, and the other hair that was found on one of the victim's nightgown did not match Epperson or his co-defendants. Evidently, Taylor did not forward the test results to Epperson or the Commonwealth's Attorney. At Epperson's retrial, Taylor's testimony from his first trial was read into evidence since Taylor was unavailable to testify at retrial. Taylor's testimony from the first trial made no mention of the DNA test results since the testing had not yet been performed at that time.

In 2008, Epperson's post-conviction counsel discovered in the record Epperson's motion for DNA testing and the court order authorizing it. At that time, Epperson filed a motion for a new trial and amended his RCr 11.42 motion to add claims relating to DNA testing. Epperson argued that Taylor, as

13

a state employee, had knowledge of the test results before Epperson's retrial and thus the Commonwealth, as a government agency, also was charged with knowledge and failed to provide the results to him, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Epperson maintained that because Taylor's testimony from the first trial was read into the record on retrial, without alteration to include the DNA test results, the Commonwealth knowingly submitted materially false information to the jury. Notably, Epperson did not argue that anyone in the Commonwealth's Attorney's office knew of the DNA test results prior to 2008; instead, he asserted that because the record contained his motion for DNA testing and the court order authorizing it, the Commonwealth had a duty to seek the results of that testing. Epperson further alleged that his own trial counsel was ineffective for failing to obtain the results and failing to present those results to the jury.

The burden is upon the party collaterally attacking a conviction to prove the elements of a *Brady* violation. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

> *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the information is available from another source, because in such cases there is really nothing for the government to disclose.

*Id.* (internal quotations and citations omitted). In other words, "*Brady* only applies to information which had been known to the prosecution but unknown to the defense." *Commonwealth v. Bussell*, 226 S.W.3d 96, 100 (Ky. 2007)

14

(internal quotations and footnote omitted). "*Brady* does not give a defendant a second chance after trial once he becomes dissatisfied with the outcome if he had a chance at trial to address the evidence complained of." *Commonwealth v. Parrish*, 471 S.W.3d 694, 698 (Ky. 2015) (internal quotations and citation omitted).

The trial court bifurcated the evidentiary hearing on Epperson's DNA-related claims from the hearing on his remaining RCr 11.42 claims by agreement of the parties, all of whom believed that if Epperson prevailed on the DNA claims, then a new trial would be the appropriate result. At the evidentiary hearing, Epperson's lead trial counsel testified that he did not recall receiving any DNA test results during his representation of Epperson and did not recall if any DNA test results were in the record when he took over the case in 2000. He further testified that he and co-counsel decided not to have Epperson's DNA tested to see if it matched the victim's hair because the Commonwealth did not have any scientific evidence linking Epperson to the crime scene; thus, counsel did not see the need to rebut the absence of any such evidence. Counsel stated that had he known of the DNA test results, he would have attempted to introduce those results into evidence, but that the existence of the DNA test results did not alter his argument to the jury that no scientific evidence linked Epperson to the crime scene. He stated that the existence of the test results would not have altered the trial strategy since the results did not exonerate Epperson or show he was not at the scene of the crime; they simply showed the hair on the victim was not his.

15

Following the evidentiary hearing, the trial court entered an order denying Epperson's motion for a new trial, finding that the DNA testing was performed at Epperson's request, and no one employed at the Commonwealth's Attorney's Office received the test results, or even knew about them until 2008. Thus, the court found no *Brady* violation occurred since the Commonwealth did not even have the evidence in its possession to suppress. We agree. The Commonwealth was under no obligation to obtain results of testing performed at the behest of defense counsel simply because a state agency facilitated the transfer of samples. To suggest otherwise would place a burden on the Commonwealth to keep track of defense counsel's motions. Epperson made the DNA request himself, thus had the responsibility to obtain the test results and provide them to the Commonwealth through reciprocal discovery.

With respect to Epperson's claim that the Commonwealth presented false testimony through Taylor, who testified at Epperson's first trial that no physical evidence linked Epperson to the crime scene, the trial court held that Taylor's testimony was still accurate and not perjured, and the existence of the DNA test results did not significantly alter it, despite Epperson's argument that excluding someone as a source of a hair was more exonerating than simply not finding any evidence of a person at a crime scene. Even assuming Taylor's testimony should have been supplemented to include the test results, the court found no reasonable probability exists that the outcome of Epperson's retrial would have been any different as a result. We agree.

16

Lastly, the trial court noted that Epperson's motion requesting DNA testing, and the court order authorizing it, had been in the record and readily available to Epperson's counsel since 1998. Accordingly, the court concluded that Epperson's trial counsel had been deficient for failing to thoroughly review the record. That said, the court held that no reasonable probability exists that the outcome of his trial would have been different had the test results been presented to the jury. Epperson speculated that the jury's verdict or sentence would have been different, but the jury was not persuaded that Epperson committed the murders himself; thus, they convicted him of complicity to commit murder. The fact that a hair taken from the body of a victim did not match Epperson's hair is entirely consistent with this verdict and would not have necessarily excluded Epperson from the crime scene. Accordingly, even though his trial counsel failed to uncover or present the DNA test results, we agree with the trial court that no prejudice resulted that would merit post-conviction relief.

**D. Sentencing Issues.**

Epperson alleged that trial counsel was ineffective for failing to investigate his past to uncover mitigating evidence and present that evidence during the sentencing phase of trial. Specifically, he averred that the jury should have been advised that he had been born "blue," had grown up impoverished, had been subjected to physical and emotional abuse by his father, had difficulties at school, witnessed friends die in violent circumstances, and suffered some form of brain damage caused by head

17

injuries. He claimed that had trial counsel presented this mitigating evidence to the jury, it might have imposed a sentence other than death; thus, counsel's decision not to present this evidence was inherently unreasonable.

Trial counsel has a clear "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. However, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S.Ct. 2527, 2541, 156 L.Ed.2d 471 (2003). The question before the *Wiggins* court was "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce evidence of Wiggins' background *was itself reasonable.*" *Id.* at 523, 123 S.Ct. at 2536. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S.Ct. at 2538.

Here, most of the mitigating evidence was presented by corrections officers who testified that Epperson was a model prisoner, implying that he was not a current danger to anyone. Epperson's mother, father, and sister also testified during sentencing, but none of them addressed any abuse during Epperson's childhood. For summary purposes, they testified that Epperson

18

grew up in a normal childhood home. Trial counsel's closing argument during sentencing was essentially a collateral attack on the death penalty as an institution; counsel did not attempt to make excuses for Epperson's actions.

Epperson argued that trial counsel should have presented certain mitigation evidence, such as the Dr. Peter Young report and the mitigation report generated by Anna Chris Brown. Prior to Epperson's retrial, Dr. Young generated a report noting that Epperson may have suffered from brain injuries that occurred during his childhood. Also prior to retrial, Epperson's former counsel retained mitigation specialist Anna Chris Brown, who conducted an interview with Epperson and his mother, and noted that Epperson's father whipped him with a mining belt; Epperson had an impoverished childhood; and he witnessed a close friend die after being shot by a constable deputy. During that interview, Epperson also stated that his father threw a brick at the back of his head, which knocked him to the ground but did not knock him unconscious; he reported to the treating physician that he had fallen while drunk. Epperson also claimed that his father had hit him in the head with a claw hammer. In that same interview, Epperson discussed his fortune in having "never been hurt" and "never even had a black eye." Both Dr. Young's and Anna Chris Brown's reports were in Epperson's case file and available to trial counsel. Epperson's position is that these reports should have generated red flags and caused trial counsel to investigate further.

At the evidentiary hearing, Epperson's lead trial counsel was unable to recall whether he contacted Anna Chris Brown, but stated that he did not

19

retain a mitigation specialist for retrial. He was unable to recall several files that were presented to him, including memorandums regarding Epperson's family life, but he stated that he did interview Epperson's family. He was unable to recall whether he learned of Epperson's alleged child abuse prior to trial, or after the fact in subsequent interviews with post-conviction counsel. He did recall learning that Epperson had witnessed close friends dying. Counsel testified that it would be good practice to investigate allegations of abuse and trauma if there was a valid reason to do so. Lead counsel stated that the only additional medical evidence he pursued with regards to Epperson's alleged brain injuries, beyond the reports in the file, were hospital records that reflected an automobile accident. He did not recall communicating with Dr. Young about his report with respect to Epperson's potential brain injuries but remembered reviewing psychological reports that revealed nothing of mitigating value, and counsel consciously chose not to produce those reports at sentencing. Lead counsel further testified that he believed introducing evidence of head injuries, emotional abuse and trauma during the sentencing phase of a capital murder trial must be evaluated on a case by case basis. Co-counsel testified at the evidentiary hearing that he had worked on capital murder cases before Epperson's, but customarily did not perform sentencing work. Based on his interactions with Epperson, he did not suspect Epperson suffered from any brain damage.

The trial court found that lead counsel had reviewed the case file containing evidence of mitigating value but did not interview the authors of the

20

reports contained in the case file. The court further found that co-counsel communicated with Epperson's family but performed no other investigation into mitigating evidence. The court concluded that neither counsel communicated with any mitigation specialist during their representation of Epperson, but they did have access to documents generated by a previously-retained mitigation specialist.

Based on the testimony and the documents presented, the court found that a reasonable probability exists that a juror could have concluded that Epperson suffered traumatic brain injuries, as well as physical and emotional abuse as a child, and was deprived of oxygen at birth. Still, the court found Epperson's allegations of child abuse to be wanting, considering the inconsistent statements he made during his mitigation interview that he had "never been hurt," and his mother's trial testimony that he had lived in a normal childhood home. The court also questioned just how much mitigating weight a jury would have afforded Dr. Young's report had it been presented; his report also concluded that Epperson exhibited antisocial behaviors, though stopped short of diagnosing Epperson as antisocial. The court noted that the clinical attributes of antisocial behavior as defined in Dr. Young's report include a person who is "narcissistic, fearless, pugnacious, daring, blunt, aggressive, assertive, irresponsible, impulsive, ruthless, victimizing, intimidating, dominating, self-reliant, revengeful, vindictive, dissatisfied, and resentful." The court observed that these descriptions aligned with the Commonwealth's theory of the case; that is, Epperson was the "straw boss"

and intelligent enough to plan murder. They further supported trial counsel's implicit conclusion that presentation of this report was not in Epperson's best interest.

Lastly, the trial court questioned how evidence in the form of death certificates of the friends who Epperson witnessed die would have shed any light on lead counsel's testimony that he was aware that Epperson had witnessed friends' deaths. Moreover, the court expressed doubt about how Epperson's witnessing death would lead a jury to show mercy for premeditated murder. Many people have witnessed loved ones die but did not engage in robbery, burglary, and murder of others as a result.

The trial court distinguished this case from *Wiggins*, in that Epperson's trial counsel had the detailed reports in the case file; in *Wiggins*, trial counsel was found to be ineffective since they could have obtained mitigating reports had they investigated further. 539 U.S. at 524–526, 123 S.Ct. at 2537–38. The trial court noted that no meaningful evidence had been presented during Epperson's evidentiary hearing that counsel should have discovered, but failed to discover, evidence due to poor investigatory work. Rather, most of the reports Epperson cited were already in the file, which led the trial court to conclude that because the evidence in the file was so detailed, counsel's decision not to present this mitigation evidence was a strategic one.

The court further held that even if it was to find that trial counsel was deficient for failing to investigate and present certain mitigating evidence, no reasonable probability exists that Epperson's sentence would have been any

different. The court found that the cold-blooded execution of the victims was beyond mitigating, and no juror would have granted him sympathy. To wit, Epperson has been twice convicted and sentenced to death for these crimes: 24 individuals have sat in judgment of him, and all found him guilty of robbing the victims. In his first trial, 12 jurors concluded that he also murdered the victims. The 12 jurors who sat on his second trial found him guilty of complicity to murder the victims. All 24 jurors sentenced him to death.

We find the trial court's findings of fact and conclusions of law sound. The record reveals substantial mitigating evidence that Epperson's trial counsel presented to the jury during the sentencing phase. More importantly, the mitigating evidence that Epperson alleges his trial attorney should have investigated further and presented to the jury seemingly conflicts with other mitigating evidence that trial counsel did present to the jury, which could have undermined all mitigating evidence presented.

For example, as it relates to Epperson's mental health, Epperson alleges that he suffers from brain damage; however, the same doctor WHO testified as to this brain damage also testified that Epperson has an average to above-average IQ. Additionally, the testimony of Epperson's family members as to, what they call, his "normal" and "good" childhood seriously undermines the almost completely different picture that Epperson painted of his purportedly horrible childhood. Differing testimony, like this, would have seriously undermined Epperson's credibility and may have caused the jury to think less of the totality of the mitigating evidence presented before it.

Additionally, we find the Eleventh Circuit's discussion of this issue particularly relevant here:

> [W]e have never held that counsel must present all available mitigating circumstance evidence in general, or all mental illness mitigating circumstance evidence in particular, in order to render effective assistance of counsel. To the contrary, the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence, including some relating to the defendant's mental illness was available. In an even larger number of cases we have upheld the sufficiency of counsel's performance in circumstances...Where counsel presented evidence in mitigation but not all available evidence, and where some of the omitted evidence concerned the defendant's mental illness or impairment. Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence, or all available mental illness or impairment evidence, in order to render effective assistance of counsel at the sentence stage.... Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland v. Washington.*

*Water v.* Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995). Having identified in detail the circumstances of Epperson's case, we find that the totality of circumstances favors a finding that trial counsel did not render ineffective assistance of counsel for failing to present the purported mitigating evidence that Epperson suggests should have been presented to the jury during the sentencing phase. We cannot say that trial counsel acted "unreasonably" in his conducting of the penalty phase or that his purported failure to act constitutes ineffective assistance.

If Epperson's argument is that trial counsel should have presented the mitigating evidence he suggested, in lieu of the evidence that trial counsel

24

presented, this argument fails, as well. As stated, the evidence that Epperson wanted trial counsel to discuss conflicted with the mitigating evidence that trial counsel submitted. Epperson's evidence purported to show that he was a tormented and brain-damaged soul that should garner sympathy, while the evidence of record purported to show that Epperson was really a good person who acted uncharacteristically. Both theories constitute reasonable, viable theories of mitigation; simply because one theory of mitigation failed in hindsight does not make trial counsel's pursuance of that theory or failure to pursue the alternative theory unreasonable.

"When a defendant challenges a death sentence...the question is whether there is a reasonable probability that...the sentence...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Even if we did find that counsel was deficient for failing to introduce, investigate, or pursue the mitigating evidence that Epperson argues should have been admitted, we agree with the trial court that no reasonable probability exists that Epperson's sentence would have been any different. We fail to see how the jury would have ruled differently had the mitigating evidence Epperson argues should have been introduced, that Epperson allegedly suffers from brain damage and had a bad childhood, in the face of the overwhelming evidence against Epperson, referred to as the "straw boss" who gave orders, and the brutal nature of his crimes. The Commonwealth also points out that it could have countered nearly all of Epperson's purported mitigating evidence with its own evidence.

25

*E. McCoy v. Louisiana, 138 S.Ct. 1500 (2018).*

Related to his assertion of ineffective assistance of counsel because of counsel's presentation of what Epperson refers to as "inconsistent defenses," Epperson alleges that the recently decided U.S. Supreme Court case of *McCoy v. Louisiana* affects the propriety of his convictions. On the facts of this case known to us at this time, we disagree.

The Court in *McCoy* held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right 'to have the *Assistance* of Counsel for *his* defense,' the Sixth Amendment so demands." *Id.* at 1505. "[W]e agree with the majority of state courts of last resort that counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." *Id.* at 1510. "Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless-error review." *Id.* at 1511.

The defendant in *McCoy* was indicted on three counts of first-degree murder, for which the prosecution sought the death penalty. *Id.* at 1506. The defendant pleaded not guilty, and throughout the proceedings consistently maintained that he was out-of-state at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. *Id.* The defendant's counsel determined that the evidence against the defendant was overwhelming

and that, absent a concession at the guilt stage that the defendant was the killer, a death sentence would be impossible to avoid. *Id.*

The defendant was "furious" when told that his counsel would concede guilt. *Id.* The defendant told counsel "not to make that concession," and counsel knew of the defendant's "complete opposition" to the concession. *Id.* The defendant pressed counsel to pursue acquittal. *Id.* When the defendant and counsel sought to end their relationship, the trial court refused. *Id.* The trial court stated, "You are the attorney," when told counsel expressed disagreement with the defendant's wish to put on a defense case, and additionally, "You have to make the trial decision of what you're going to proceed with." *Id.*

At trial, during his opening statement, counsel told the jury there was "no way reasonably possible" that they could hear the prosecution's evidence and reach "any other conclusion than [the defendant] was the cause of these individuals' death[s]." *Id.* The defendant protested; out of earshot of the jury, the defendant told the trial court that counsel was "selling him out" by maintaining the defendant's guilt. *Id.* The trial court reiterated that counsel was "representing" the defendant and that the court would not permit "any other outbursts" from the defendant. *Id.* at 1506-07. Continuing his opening statement, counsel told the jury the evidence is "unambiguous" and, "my client committed three murders." *Id.* at 1507.

The defendant testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom. *Id.* In closing argument, counsel

reiterated that the defendant was the killer. *Id.* On that issue, counsel told the jury that he "took the burden off of the prosecutor." *Id.*

The jury returned a unanimous verdict of guilty of first-degree murder on all three counts, recommending a sentence of death. *Id.*

In its analysis, the Court contrasted its decision in *Florida v. Nixon*, 543 U.S. 175 (2004), with that of *McCoy.* 138 S.Ct. at 1509-10. The Court held in *Nixon* "that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, '[no] blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy." *Id.* at 1505 (citing *Nixon*, 543 U.S. at 181). In *Nixon*, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. *McCoy*, 138 S.Ct. at 1505 (citing *Nixon*, 543 U.S. at 186). Counsel did not negate the defendant's autonomy by overriding the defendant's desired defense objective, for the defendant in *Nixon* never asserted any such objective. *McCoy*, 138 U.S. at 1509 (citing *Nixon*, 543 U.S. at 181).

Importantly, the defendant in *Nixon* complained about the admission of his guilt only after trial, *McCoy*, 138 U.S. at 1509 (citing *Nixon*, 543 U.S. at 185), unlike the defendant in *McCoy*, who "opposed [counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *McCoy*, 138 S.Ct. at 1509. In contrast to *Nixon*, the defendant in *McCoy* "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *Id.* at 1505. "If a client

28

declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." *Id.* at 1509.

We highlight in detail the factual circumstances of *McCoy* because the factual circumstances in the case at hand are very different. On the facts that we have available in this record, nothing of the sort that occurred in *McCoy* occurred in Epperson's case. As discussed in our analysis of Epperson's "inconsistent defenses" argument, counsel for Epperson simply suggested to the jury that Epperson's involvement in this case, if any, was driving the getaway car. Epperson claims that counsel elicited evidence on this fact during cross-examination of a witness and then told the jury in closing argument that Epperson had driven the getaway car. This fact, and this fact alone, is the only fact that Epperson points to in the entirety of his argument on this point.

Epperson has not evidenced "intransigent" or "vociferous" objection to trial counsel's strategy, nor has he evidenced objection to trial counsel's strategy "at every opportunity, before and during trial, both in conference with his lawyer and in open court." Id at 1509. More importantly, it does not appear that counsel ever explicitly conceded guilt on any of Epperson's charges but rather stated that Epperson may have been or was the getaway driver during the commission of the crimes. This concession does not appear to be the type of concession upon which *McCoy*'s holding is predicated. And even if it were, the lack of evidentiary and factual support for Epperson's claim leads us to the conclusion that it is meritless.

29

Because we find striking dissimilarities between Epperson's case and *McCoy*, we reject Epperson's argument on this point.

## F. Cumulative Error.

Since we have found no merit in any of Epperson's individual claims, no cumulative error can exist.

## IV. CONCLUSION.

As the trial court noted, "trials are never perfect, and with decades to sit and wonder what could have been, it becomes easy to latch onto small imperfections and believe they made the difference." We agree with the trial court that Epperson has failed to meet his burden to obtain relief under RCr 11.42. For the foregoing reasons, we affirm the Warren Circuit Court's order denying Epperson's RCr 11.42 motion for post-conviction relief.

Minton, C.J.; Cunningham, Hughes, Keller, VanMeter and Venters, JJ., concur. Wright, J., not sitting.

COUNSEL FOR APPELLANT:

David Michael Barron
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Julie Scott Jernigan
David Bryan Abner
Assistant Attorney General

2017-SC-000044-MR

ROGER DALE EPPERSON                                    APPELLANT

V.                      ON APPEAL FROM WARREN CIRCUIT COURT
                        HONORABLE STEVE ALAN WILSON, JUDGE
                              CASE NO. 97-CR-000016

COMMONWEALTH OF KENTUCKY                                APPELLEE

**ORDER GRANTING PETITION FOR REHEARING AND WITHDRAWING AND
REISSUING OPINION**

The Court, being fully and sufficiently advised, ORDERS that:

1. Appellee's motion filed April 11, 2018, to publish our opinion in
   *Epperson v. Commonwealth*, 2017-SC-000044-MR, rendered March
   22, 2018, is DENIED;

2. Appellant's motion filed May 18, 2018, entitled "CR 76.34 motion
   for leave to supplement petition for rehearing and consolidated
   supplement to petition for rehearing", is GRANTED;

3. Appellant's motion, filed May 18, 2018, entitled "CR 76.34 motion
   to stay proceedings regarding the petition for rehearing, to
   maintain jurisdiction, and to issue a limited remand for the circuit
   court to make additional findings and conclusions of law in light of

1

the intervening decision of *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018)", is DENIED;

4. Appellant's Petition for Rehearing is GRANTED; and,

5. The Opinion of the Court rendered herein on March 22, 2018, is hereby withdrawn, and the attached Opinion is reissued in lieu thereof.

Minton, C.J., Cunningham, Hughes, Keller, VanMeter and Venters, JJ., sitting. All concur. Wright, J., not sitting.

ENTERED: August 16, 2018.

CHIEF JUSTICE

2