RENDERED: FEBRUARY 21, 2008
TO BE PUBLISHED

# Supreme Court of Kentucky

2005-SC-000967-DG & 2006-SC-000151-DG

KAREN BROWN                                APPELLANT

ON APPEAL FROM COURT OF APPEALS
CASE NUMBERS 2003-CA-002624 & 2003-CA-002714

V.                 FAYETTE CIRCUIT COURT NO. 86-CR-000172-002

COMMONWEALTH OF KENTUCKY                APPELLEE

## OPINION OF THE COURT BY JUSTICE SCOTT

## <u>AFFIRMING</u>

Appellant, Karen Brown, appeals the Court of Appeals' reversal of the Fayette Circuit Court's grant of her RCr 11.42 motion. The motion argues that her counsel, Julius Rather, provided ineffective assistance to her during her trial for the murder of Michael Turpin. For the reasons set forth herein, we affirm the Court of Appeals.

## I. Facts and Procedural History

In February 1986, the body of Michael Turpin was found in a pond at the Lakeside Golf Course in Lexington, Kentucky. Michael had been stabbed multiple times. His wife Elizabeth Turpin, Keith Bouchard, and Appellant, who were all friends, quickly became suspects in the case.

Appellant was questioned by the police regarding her involvement in the murder. During the first half of her interview, she maintained her and her friends'

innocence. She discussed how when she was younger her father was poisoned and how she had physically fought with him on occasions. In the latter half of the interview, she admitted to assisting Bouchard in killing Michael. She admitted to driving Bouchard to Michael's apartment, helping him gain entry to the apartment, and helping him dispose of the body at the golf course. She also admitted to trying to obtain a gun for Bouchard that night. Rather, Appellant's counsel, got the most incriminating parts of Appellant's statement suppressed by the trial court prior to trial.

Also before trial, Bouchard accepted a plea deal from the Commonwealth in return for his testimony. Bouchard then became the Commonwealth's star witness. At trial, the Commonwealth developed the following facts regarding the events leading to Michael's death. Michael and Elizabeth were married in August 1985 and moved into an apartment in Lexington. Elizabeth got a job with a local car dealership, where she met and developed a friendship with Appellant and Bouchard. Appellant developed a romantic interest in Elizabeth and the two then began to hang out together. Testimony also indicated that on several occasions the two shared passionate kisses. Elizabeth then became dissatisfied with her marriage alleging that Michael beat her. She stated in January 1986, she planned to divorce Michael. Michael on the other hand, made Elizabeth the beneficiary of his $50,000 life insurance policy in January 1986.

Several witnesses testified that Appellant and Elizabeth discussed killing Michael to collect the insurance proceeds. Anthony Basham testified that after a night of drinking and drug usage, Appellant told Elizabeth she knew of someone

2

who would kill Michael for money. This was Bouchard, who the evidence indicated had asked one of his co-workers how to blow up an automobile.

On the night of February 2, 1986, Appellant, Elizabeth, and Bouchard, attended a local club, The Circus, where Appellant was to perform a drag show. Elizabeth drove them to the club. When the Appellant went on stage to perform, she dedicated the performance to a woman named "Liz" and she and Elizabeth shared a kiss at the end of the show. At some point during the evening, while standing outside smoking marijuana, Elizabeth and Appellant concluded that someone had moved Elizabeth's car. Both surmised that Michael had moved it and this belief further fueled the plans to have him murdered.

Bouchard testified that he had asked either Appellant or Elizabeth for a gun to kill Michael with. Don Souleyrette, a friend of Appellant, testified that she came by his place the night of the murder and asked him for a gun, stating she needed it because her abusive father was in Lexington. Souleyrette did not give her a gun.

Appellant then returned to her apartment where Elizabeth and Bouchard were waiting. The three again discussed the murder plans. After a while, Appellant and Bouchard went to Bouchard's trailer in Jessamine County and picked up some knives. They then went to Michael's apartment. At the apartment, Appellant knocked on the door and got Michael to open it, helping Bouchard gain entry. Bouchard then attacked Michael, stabbing him multiple times.

Bouchard testified at trial that Appellant helped him fight with Michael, but when it came time to "finish him off," she said "she could not do it." Following the

3

murder, Appellant and Bouchard loaded Michael into her car and drove to the golf course where they dumped his body. Appellant later cleaned her car with bleach and Bouchard had a friend throw away the tennis shoes he wore that night. Evidence was also established that Appellant asked her roommate to provide her with an alibi for the night of the killing.

Appellant and Elizabeth were tried and convicted together of capital murder and although the death penalty was available, the jury sentenced them both to the lesser penalty of life imprisonment without parole for twenty-five years. Appellant's conviction was upheld on direct appeal in Brown v. Commonwealth, 780 S.W.2d 627 (Ky. 1989).[1]

Appellant did not testify during the guilt or penalty phase of her trial. In this regard, Appellant had the following discussion with the trial judge on the record:

> Trial Judge: And, the Court will now ask Karen Brown at the request of [Rather], is it your decision not to present any testimony in your behalf?
>
> Appellant: Yes, sir.
>
> Trial Judge: Are you under any fear, threats, duress, any strain whatsoever that compel you to make that decision?
>
> Appellant: No, sir.
>
> Trial Judge: It is made by your own free will and accord, voluntarily, freely, intelligently, and understandably?
>
> Appellant: Yes, sir.

---

[1] Elizabeth's conviction was upheld on direct appeal in Turpin v. Commonwealth, 780 S.W.2d 619 (Ky.1989). She unsuccessfully sought habeas corpus relief in the federal court system. See Turpin v. Kassulke, 26 F.3d 1392 (6th Cir.1994). Finally her RCr 11.42 motion based on ineffective assistance of counsel was denied by the Fayette Circuit Court. The Court of Appeals affirmed that denial in an unpublished opinion.

Trial Judge: You don't care to present any testimony whatsoever in behalf of your defense?

Appellant: No, sir.

Rather presented no witnesses for Appellant during the guilt phase yet did cross-examine opposing witnesses. He called three witnesses for Appellant in the penalty phase. These witnesses testified that Appellant was not a leader, but a good team worker with a strong work ethic.

In contrast Elizabeth, Appellant's co-defendant, who received the same conviction and sentence as Appellant, did testify during the guilt phase as well as present three witnesses. Elizabeth, however, presented no witnesses during the sentencing phase.

On April 22, 1997, Appellant filed her RCr 11.42 motion in the Fayette Circuit Court, alleging Rather provided ineffective assistance of counsel. In particular, Appellant alleged that Rather was ineffective by failing to follow his defense strategy or alternatively, offer other theories of how the crime may have occurred. Appellant further argued that Rather did not inform her of her right to testify during either the guilt or sentencing phase. Appellant also complained of Rather's failure to question the mental state of Bouchard, since evidence was developed after trial indicating that he suffered from severe depression. Allegedly, this evidence could have been used to discredit his testimony. The Fayette Circuit Court initially denied Appellant's RCr 11.42 motion without a hearing, but was reversed by the Court of Appeals and ordered to hold a hearing.

Rather, testifying from his memory of events seventeen years ago, was the first witness at the hearing. He testified that he had practiced criminal law

5

since 1960, but that Appellant's murder trial in 1986 was his first death penalty case. He testified that when you have a case with multiple defendants, it is best to try and get your client a deal with the Commonwealth in exchange for their testimony. Rather testified he tried to do that in Appellant's case and, in fact, had gotten the Commonwealth to offer her a fifteen-year sentence in exchange for her testimony. However, Appellant declined this offer, pressing for a three-year sentence, which the Commonwealth declined.

Rather testified that Appellant's case was tough, not only because the Commonwealth had Bouchard's testimony, but it involved the death penalty. Thus, he could not err in making available any evidence that made the crime, or Appellant's culpability, appear worse. Therefore, his primary strategy was to insure that the jury did not perceive Appellant as the leader of the murder plot. To do this, he had to make Bouchard appear as the mastermind of the scheme through his cross-examinations, which he vigorously pursued.

Rather also acknowledged he advised Appellant not to testify at trial. This decision was in part due to the incredibly tough cross-examination of Elizabeth by the Commonwealth. Elizabeth's cross-examination included several instances where she was made to look like a liar or manipulator. She was made to cry several times on the stand. When Rather asked Appellant if she could handle testifying after watching Elizabeth's cross-examination, she told him no. He honestly feared that if Appellant could not handle a strong cross-examination it would make her look more culpable than she really was.

Additionally, if Appellant testified, then her suppressed police statement could be introduced into evidence. He also wanted to avoid any testimony

6

regarding situations where Appellant exhibited aggressive behavior and was afraid that Appellant's infatuation with Elizabeth would cause her to color her testimony to protect Elizabeth, thus hurting her defense.

He also testified that he had reviewed potential evidence for the penalty phase but decided that much of it would ultimately hurt his client. He did not want Appellant's mother to testify because he was afraid that the jury could find out through her about Appellant's strange relationship with her father. Additionally, if she testified, the Commonwealth would have inevitably introduced evidence that she was once suspected in the poisoning of Appellant's father – evidence that would have made both Appellant and her mother look bad. Appellant's mother also indicated to Rather that she could not handle testifying. In fact, most of the friends Appellant wanted to testify, were going to testify to what a leader Appellant had been – Rather believed this would hurt his defense and potentially isolate Appellant as the leader, increasing her risk of the death penalty. Rather discarded other friends as potential witnesses because he feared Appellant's prior incidents of aggressive behavior would surface.

Rather did not present any evidence of Bouchard's potential mental illness because (1) the psychiatric examination had found Bouchard sane and opined that his alleged insanity was just an act, and (2) he needed the jury to believe Bouchard was sane because it helped him develop his trial strategy that Bouchard and Elizabeth were the leaders of the murder scheme. He was afraid if the jury believed there was some question about Bouchard's mental state, it would make the jury more likely to find that Appellant was the mastermind, thus also heightening her exposure to the death penalty.

7

Finally, Rather testified he did not remember if he had offered a jury instruction on renunciation, but if he had, it would have been to take advantage of Appellant's statement during the crime that she could not go through with the act of killing Michael with a knife. He noted however, that Appellant made this statement after the fight with Michael had begun, *not at the front door before the attack.* He did not remember his opening or closing statements and could not remember why he said he would prove that Appellant is not guilty.

Appellant testified next. She acknowledged that she had not been fully forthcoming with Rather about the facts of the case at the beginning of the trial, but by the end of the trial had "come completely clean" with Rather about what really happened. She did not, however, remember discussing trial strategy with Rather until the day of Elizabeth's testimony nor, could she remember if Rather had told her what he planned to present at trial as evidence.

She testified that after the defense rested, Rather prepared her to go to the judge's chambers to be questioned about not testifying. She acknowledged that Rather reminded her that if she testified she would be subject to the same cross examination Elizabeth had endured on the stand. She further testified that Rather told her that it would be unwise for her to testify because she could become upset on the stand and it would be bad for the jury to see this. Appellant admitted that *she would have been upset and emotional on the stand,* but she could not see how it would have hindered her defense. Appellant also testified she did not know she had the right to testify, she just believed she had to do what Rather told her. However, on cross-examination, Appellant admitted she answered in the affirmative when asked by the trial judge if the decision to testify

8

was (1) her decision, (2) it was made of her own free will, (3) made voluntarily, and intelligently, and (4) she was not under any threat, fear, duress, or strain, in so answering. Appellant also admitted that the trial judge did inform her of her right to testify.

Appellant then gave an account of Michael's murder that differed from her original statement to the police as well as the facts developed at trial. Moreover, she acknowledged that she initially felt the need to protect Elizabeth because she always protected her friends. As she found out more things about Elizabeth she realized, however, that Elizabeth had been using her.

Appellant admitted that her initial statement to the police was full of lies, partly because she was afraid to admit her involvement with drugs and partly to protect her friends. Appellant then admitted that she said in her pre-sentence investigation report that since her statement to the police was full of lies, she could not testify at trial.

Appellant then presented thirteen people from her past, all of whom indicated that they would have been willing to testify during the penalty phase if asked. Eight of the witnesses were from Appellant's high school days, but had lost contact with her after she went to college. Four additional witnesses knew Appellant during her time at college but more or less lost contact with her once she moved to Lexington. Appellant's mother was the last witness presented.

Dr. Wagner, a clinical psychologist, was called next to review the psychiatric records of Bouchard. Dr. Wagner believed that Bouchard was suffering from severe depression at the time of trial, possibly at a psychotic level, and that he also experienced some level of thought disorder. Thought disorder,

9

according to Dr. Wagner, can lead to a general misperception of events and circumstances and a distortion of both current events and past events. Dr. Wagner also evaluated the report of Dr. Blouse, whom Rather relied upon at the time of trial. He noted Dr. Blouse's report did not indicate that Bouchard had undergone psychiatric testing, yet it concluded that Bouchard was faking mental illness. Dr. Wagner believed that Bouchard's test results were inconsistent with a person who was faking mental illness.

Rather was then recalled as a witness. He again reiterated his fear of how Appellant's affection for Elizabeth may have caused her to try and protect Elizabeth with her testimony causing her to seem more culpable than she really was for the crime. He believed allowing Appellant to testify would just give Elizabeth's counsel another chance to blame Appellant for the crime and that Appellant did not have the maturity at the time to testify. Hence, he believed that her testifying would have been a grave mistake, potentially highlighting her as a leader in the murder plot and making her a standout target for the death penalty. According to Rather, there was no point during the trial where Appellant "came clean" with him and told him what "really happened." In fact, during trial Appellant disagreed very little with Bouchard's testimony.

Following the evidentiary hearing, the Fayette Circuit Court entered an order granting Appellant's RCr 11.42 motion for a new trial on the grounds that Rather's failure to have Appellant testify and the lack of mitigation evidence presented during the penalty phase constituted ineffective assistance of counsel. *Quite pointedly, the Fayette Circuit Court was convinced that the only way Appellant could have proven her innocence, was to testify.* The trial court further

10

believed that if Appellant had testified, a renunciation instruction would have been supported by the record. The order further states that the record did not reflect that Appellant was informed of her right to testify and that Rather did not adequately investigate Appellant's life history and thus did not present crucial evidence to the jury during the penalty phase. The court denied Appellant's argument on the grounds that Rather's failure to question Bouchard's mental status constituted ineffective assistance of counsel.

On review, the Court of Appeals reversed the trial court's order, finding instead that Rather provided effective assistance of counsel under the circumstances. The Court of Appeals held that it was not ineffective assistance of counsel for Rather to advise Appellant not to testify because of his concerns that she would not be able to handle a strong cross-examination by the Commonwealth. Rather's concerns about the subsequent allowance of Appellant's suppressed statement for impeachment purposes provided further reason to keep Appellant from testifying. It was also noted that the record indicated that Appellant answered affirmatively when asked by the original trial judge, if she had decided not to testify by her own volition. Ultimately, the Court of Appeals believed that Rather relied on the facts Appellant gave him at the time of her trial, and that his assumptions and strategies in light of that information were reasonable.

The Court of Appeals also found that Rather provided effective assistance of counsel by virtue of the witnesses he selected to use during the penalty phase of trial; witnesses whose testimony was in line with his general defense theory — that Appellant was a follower and not a leader. Moreover, the witnesses Rather

elected not to use would have testified to some extent to facts that made Appellant look more like an assertive person or leader. The Court also concluded that the record disclosed valid reasons to keep the additional witnesses and Appellant from testifying during the penalty phase of trial.

Finally, the Court of Appeals held that Rather was justified in not attacking Bouchard's mental health. The Court of Appeals found that the psychiatric report made by Dr. Blouse indicated that Bouchard was competent and that he was faking mental illness. Since Rather wanted Bouchard to look like the leader of the plot to kill Michael, it was reasonable for him to accept the findings of the psychiatric report. Ultimately the Court of Appeals believed that while Rather's planned defense may not have been the best strategy, it was the result of a conscientious decision on his part.

## II. Standard for ineffective assistance of counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). These standards are set forth in Strickland. They require the defendant to prove two main elements. First, that his counsel's performance was deficient. Id., 466 U.S. at 687, 104 S. Ct. at 2064. "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, that counsel's deficient performance prejudiced the defendant's defense. Id. "This requires

12

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

## A. Counsel's Performance

The proper test to use when judging counsel's performance is whether counsel provided "reasonably effective assistance." Id. 466 U.S. at 687, 104 S. Ct. at 2064. There are no set rules or guidelines for analyzing counsel's performance because those may "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Id., 466 U.S. at 689, 104 S. Ct. at 2065. This standard simply asks, was the attorney's performance unreasonable under prevailing professional norms? Id., 466 U.S. at 688, 104 S. Ct. at 2065. Not today's norms, but "norms" of the time. That conduct must be reasonable considering all of the case's circumstances and facts. Id.

Additionally, a court's review of counsel's performance must be highly deferential. Id., 466 U.S. at 689, 104 S. Ct. at 2065. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.; Hodge v. Commonwealth, 116 S.W.3d 463, 469 (Ky. 2002). Hence, the defendant must overcome the presumption that counsel provided a reasonable trial strategy. Id. Counsel's trial actions can reasonably be based on strategic choices made by the defendant and on information supplied by the defendant, Id., 466 U.S. at 691, 104 S. Ct. at 2066, and "when a defendant has given counsel reason to believe that pursuing certain investigations would be

13

fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Id.

There is much wisdom in keeping the deficient performance standard flexible and deferential to counsel, especially when the natural tendency is to view the performance in light of the result.

> The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Id., 466 U.S. at 690, 104 S. Ct. at 2066. "Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Id., 466 U.S. at 697, 104 S. Ct. at 2069.

### B. Deficient Performance And Prejudice

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 466 U.S. at 690, 104 S. Ct. at 2066. In this regard, "[t]he defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. This "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. This is not just a "mere outcome determination." Lockhart v. Fretwell, 506 U.S. 364, 369-

14

370, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). Setting aside a conviction just because counsel's error may have caused a different outcome gives the defendant too great of an advantage. Id. Instead the question should be absent counsel's errors, would the factfinder have had a reasonable doubt respecting guilt? Strickland, 466 U.S. at 695, 104 S. Ct. at 2068-2069. Kentucky courts have previously articulated this standard as "counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." Haight v. Commonwealth, 41 S.W.3d 436, 441 (Ky. 2001) citing United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992). "The critical issue is not whether counsel made errors but whether counsel was so thoroughly ineffective that defeat was snatched from the hands of probable victory." Id.

To see if the factfinder would have had reasonable doubt, the court must review the evidentiary record available to the judge or jury. Strickland, 466 U.S. at 695, 104 S. Ct. at 2068-2069. Surely, a verdict or conclusion which has little evidentiary support is more likely to have been affected by counsel's error than a verdict which is supported by substantial evidence. Id., 466 U.S. at 696, 104 S. Ct. at 2069. But, overall, the court must review the factual findings that were untainted by counsel's errors with the findings that were affected by counsel's errors to see if the defendant met the burden of showing that the decision reached would have been reasonably likely to be in his favor absent the errors. Id.

### C. Standard of Review

15

At the trial court level, "[t]he burden is upon the accused to establish convincingly that he was deprived of some substantial right which would justify the extraordinary relief afforded by . . . RCr 11.42." Dorton v. Commonwealth, 433 S.W.2d 117, 118 (Ky. 1968). On appeal, the reviewing court looks de novo at counsel's performance and any potential deficiency caused by counsel's performance. Groseclose v. Bell, 130 F.3d 1161, 1164 (6th Cir. 1997); McQueen v. Scroggy, 99 F.3d 1302, 1310-1311 (6th Cir. 1996), overruled on other grounds by, In re Abdur'Rahman, 392 F.3d 174 (6th Cir. 2004).

And even though, both parts of the Strickland test for ineffective assistance of counsel involve mixed questions of law and fact, the reviewing court must defer to the determination of facts and credibility made by the trial court. McQueen v. Commonwealth, 721 S.W.2d 694, 698 (Ky. 1986). Ultimately however, if the findings of the trial judge are clearly erroneous, the reviewing court may set aside those fact determinations. Ky. CR 52.01 ("[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witness.") The test for a clearly erroneous determination is whether that determination is supported by substantial evidence. Black Motor Co. v. Greene, 385 S.W.2d 954, 956 (Ky. 1964). This does not mean the finding must include undisputed evidence, but both parties must present adequate evidence to support their position. Hensley v. Stinson, 287 S.W.2d 593, 594 (Ky. 1956).

In appealing from the trial court's grant or denial of relief based on ineffective assistance of counsel the appealing party has the burden of showing that the trial court committed an error in reaching its decision.

16

### III. Analysis

The Court of Appeals held that the Fayette Circuit Court incorrectly found that Rather provided ineffective assistance of counsel because he did not have Appellant testify during the guilt and penalty phases of trial and because some potential mitigation evidence was not presented during the penalty phase of trial. The Court of Appeals affirmed the Fayette Circuit Court's ruling denying relief on Rather's decision not to investigate Bouchard's mental history. We will now analyze each of these holdings under the standards discussed above.

### A. Failure to Testify at Guilt Phase

The trial court's order held that the only way to show that Appellant was innocent at the guilt phase was to have her testify and counter the testimony that Bouchard and Elizabeth presented against her. However, upon a thorough review of the record, Rather's advice to keep Appellant from testifying was not unreasonable and did not amount to ineffective assistance of counsel. In this analysis, we should not lose sight of the fact that this was a death penalty case.

As an initial matter, we must review Rather's trial actions to see if they were deficient or unreasonable under prevailing professional standards. Rather's initial strategy in this case was to make a plea bargain with the Commonwealth for Appellant. After Appellant rejected the Commonwealth's offer, Rather chose a trial strategy which would show Appellant was either not guilty through a "reasonable doubt" defense in case the Commonwealth's case fell short of their burden of proof, or at the very minimum, show that she was not the leader or mastermind of the scheme to kill Michael in order to insulate her from the death penalty. As Rather stated at the evidentiary hearing, in a death penalty case

17

*"you don't try things that will make it worse."* In fact, most experienced criminal defense counsel would argue that when all you have in a death penalty case is a possible "reasonable doubt defense," you must focus on avoiding or minimizing facts that could increase your defendant's chance of receiving the death penalty. That, in itself can be considered a victory. See Russell Stetler, <u>Capital Cases: Mitigation Evidence in Death Penalty Cases</u>, Champion, Jan.-Feb. 1999 at 35 ("The paradox of death penalty litigation is that no case is hopeless, but there is also no guarantee of success - that is, avoiding a death sentence - when a case enters a sentencing proceeding.")

It is with this strategy in mind that Rather made the decision to advise Appellant not to testify. In making this decision, Rather was concerned with keeping the incriminating statements that Appellant made to the police suppressed as much as he could. Had Appellant testified, *all* these statements would have obviously been used for impeachment. Those statements included her admission that she had helped Bouchard gain entry into Michael's apartment *fully-knowing his potential intent to kill Michael* and that Appellant had even attempted to borrow a gun from a friend *for Bouchard – not because her father was in town.* Even Appellant, at the evidentiary hearing, admitted that she previously said this statement was full of lies and it was a major reason why she *could not* testify at trial.

During the trial, Appellant obviously agreed with Rather's advice because she discussed her decision not to testify with the judge. She acknowledged it was her own voluntary decision not to testify and that she was not coerced by

anyone in making that decision. She further acknowledged that *she knew* she had the right to testify, but was waiving it.

In the evidentiary hearing, Appellant admitted that she was not honest with Rather about what happened the night of Michael's murder but claimed that at some time during the trial she had come clean and let him know her version of the facts. What Appellant initially told Rather was based in part on her desire to protect Elizabeth at the time.

Thus, we cannot hold that Rather's strategy to keep Appellant from testifying was professionally unreasonable in light of the facts of the case. From the evidence at hand, it does not appear possible that Appellant could have been found not guilty if she had testified. Interestingly, Elizabeth did testify, yet received the same sentence as Appellant. The risk of the suppressed statement being used to impeach Appellant was too great. Moreover, the admittance of that statement could have increased the risk of the death penalty being imposed.

Importantly, counsel's strategy may be influenced by what his client says. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. His actions are to be viewed in light of what was known at the time of trial and his acts are to be given great deference. Id. The trial court failed to give Rather's actions under the particular circumstances of this case the deference required, and thus, committed error.

Additionally, the trial court held that Appellant's testimony may have provided the evidentiary grounds for the trial court to give a renunciation jury instruction. KRS § 506.020 ("it is a defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant abandoned his effort to commit the crime and, if mere abandonment

19

was insufficient to avoid the commission of the crime, took the necessary affirmative steps to prevent its commission.") However, all of the evidence presented at the time of trial indicated that Appellant's declaration "I can't go through with it," occurred *after the attack* on Michael had begun. Appellant's behavior after her statement was also not indicative of someone who took steps to prevent the commission of a criminal act. The slim chance that a jury would buy a renunciation defense was obviously too low for Rather to risk Appellant's suppressed statement being admitted.

Thus, Rather's actions did not constitute deficient or unreasonable professional conduct under the circumstances and evidence he faced at the time. Therefore, the Court of Appeals was correct in holding that Rather did not provide ineffective assistance of counsel by not allowing Appellant to testify at the guilt phase of trial.

### B. Testimony at the penalty phase of trial

The trial court also held that it was ineffective assistance of counsel for Rather to keep Appellant from testifying at the penalty phase of trial. We therefore must review this holding first, to see if the advice was deficient or unreasonable under the prevailing professional standards.

The same basic concerns that Rather had about Appellant testifying during the guilt phase also applied during the sentencing phase. And he had good reason to keep Appellant from what could have been potentially as damaging a cross-examination as was Elizabeth's. Rather's main focus at this point, and rightfully so, was to ensure that Appellant was not sentenced to death. His strategy was successful.

Hindsight may lead one to guess that it would have been better for Appellant to testify to attempt to gain sympathy from the jury. That is an easy thing to say when you are not gambling with a death sentence. It is a little more intimidating, when you are. Thus, Rather's advice not to testify was not deficient or unreasonable considering the facts of the case. Giving Rather's decision the proper deference, Rather did not provide ineffective assistance of counsel by advising Appellant not to testify during the penalty phase of trial.

### C. Presentation of mitigation evidence at penalty phase

Appellant argues that Rather did not present or attempt to present enough mitigation witnesses during the penalty phase. Rather, however, did present Donna Brown, Appellant's *only sister*; Bruce Johnson, Appellant's middle school principal; and Billie Randolph, a family friend for whom Appellant occasionally babysat. All three testified that Appellant was an intelligent, capable, and well-liked individual. *However, all three also testified that Appellant was not a leader and was more apt to follow the crowd.* This was consistent with the image and strategy that Rather was trying to create for Appellant – that by her nature she *could not have* planned or masterminded Michael's death. She was under the control of others.

Rather testified at the evidentiary hearing that he was aware of several other witnesses he could have called during the penalty phase. However, he did not call them because they would have indicated that Appellant was a leader. Additionally, Rather did not call Appellant's mother to testify because she indicated to Rather that she could not physically handle the strain.

21

Thus, Rather's actions regarding who he called as a witness during the penalty phase were not deficient or unreasonable when compared to prevailing professional standards under similar circumstances. He chose a lesser culpability strategy designed to make Appellant look less culpable for Michael's death. Therefore, he chose witnesses who would further that strategy, instead of harm it. Also, by keeping certain family members from testifying, Rather was attempting to prevent the jury from hearing about Appellant's strange family life, some of which they did anyway. Yet, his actions were designed to minimize such evidence as much as he could. Thus, his actions certainly fell within reasonable professional standards and he did not, by that standard, provide ineffective assistance of counsel.

### D. Failure to investigate Bouchard's mental stability

Appellant finally argues that Rather's failure to investigate Bouchard's potential mental illness constituted ineffective assistance of counsel. Appellant argues that if Rather had investigated and discovered the severe depression Bouchard was apparently suffering from, he could have used that in cross examination to discredit Bouchard's testimony. Dr. Wagner at the evidentiary hearing testified that the type of depression he believed Bouchard suffered from could cause him to misperceive events and circumstances and to distort both current and past events. However, the trial court and the Court of Appeals rejected this argument and so do we.

Before trial Rather had access to an examination of Bouchard performed by Dr. Blouse. Dr. Blouse concluded that Bouchard had no mental illnesses and that Bouchard was faking his problems. Rather decided not to investigate

22

Bouchard's mental state any further because he wanted Bouchard to be seen as capable of being the leader of the murder plot. He feared that if Bouchard were believed to be incompetent, the blame would fall solely on Appellant, since she was the only other person present at the murder. In this regard, Rather gave his best effort to strongly cross-examine Bouchard in an attempt to bolster his client's defense.

Considering all of the facts in play – including Appellant telling Rather facts that were not terribly inconsistent with those testified to by Bouchard – we cannot say that Rather's strategy was deficient or fell below the prevailing professional standards. The trial court and Court of Appeals correctly gave Rather's trial strategy the deference it deserved and on this issue we concur.

### IV. Conclusion

For the forgoing reasons, we hereby affirm the decision of the Court of Appeals reversing the Fayette Circuit Court's order.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Marguerite Neill Thomas
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Todd D. Ferguson
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY 40601