RENDERED: DECEMBER 10, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1041-MR

STEVEN PETTWAY                                       APPELLANT

|     | APPEAL FROM JEFFERSON CIRCUIT COURT |
| --- | --- |
| v.  | HONORABLE ANGELA MCCORMICK BISIG, JUDGE |
|     | ACTION NO. 11-CR-003052-002 |

COMMONWEALTH OF KENTUCKY                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, DIXON, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Steven Pettway appeals from the Jefferson Circuit Court's summary denial of his motion for Kentucky Rules of Criminal Procedure (RCr) 11.42 relief. We affirm as Pettway's arguments are either foreclosed by the decisions in his prior appeals, do not contain the required specificity, are refuted by the record, and/or do not establish prejudice.

The relevant facts in the underlying criminal case are as follows:

Troya Sheckles was shot and killed in Shelby Park in Louisville around 7:30 p.m. on March 23, 2009. Several people saw the shooting, and they all gave largely consistent descriptions of the shooter as being a male in dark clothing with a bandana tied around his face.

Steven Pettway and codefendant Dejuan Hammond were eventually charged with Sheckles's murder, as well as intimidating a participant in the legal process under [Kentucky Revised Statutes (KRS)] 524.040 and retaliating against a participant in the legal process under KRS 524.055.

The Commonwealth's theory of the case was that Pettway killed Sheckles at Dejuan Hammond's direction to prevent her from testifying in the upcoming murder trial of his younger brother, Lloyd Hammond. Sheckles had witnessed the killing of William Sawyers in her home in 2006 and had identified Lloyd Hammond as the killer. Pettway was friends with the Hammonds, and the then-sixteen-year-old Pettway looked up to the much older Dejuan Hammond as a sort of mentor. The Commonwealth's evidence showed, among other things, that Pettway and Dejuan Hammond knew Sheckles was the essential witness for the Commonwealth in Lloyd Hammond's upcoming murder trial and had stashed a 9-mm pistol (the same kind used in Sheckles's shooting) at a friend's house about a month before the murder. There was also testimony about numerous statements made by Pettway following the murder admitting that he had shot Sheckles so that she could not testify against Lloyd Hammond.

The jury ultimately convicted Pettway of murder and intimidating a participant in the legal process (but found him not guilty of the retaliation charge) and recommended a 50-year prison sentence for murder and

-2-

> five-year sentence for the intimidation conviction to run
> consecutively.  The trial court sentenced him to a total of
> 55 years' imprisonment in accordance with the jury's
> recommendations.

*Pettway v. Commonwealth*, 470 S.W.3d 706, 707-08 (Ky. 2015) (*Pettway I*)

(footnote omitted).

In his direct appeal, Pettway was partially successful.  The Court

concluded, even though the issue was not preserved, that Pettway could not be

properly convicted of intimidating a participant in the legal process under KRS

524.040 for intentionally killing Sheckles.  It reversed that conviction and five-year

sentence.  *Id.* at 708-10.

However, the Kentucky Supreme Court declined to give Pettway any

relief from his murder conviction based upon his argument that "delayed

disclosures of discovery material by the Commonwealth constituted arbitrary state

action prohibited by Section 2 of the Kentucky Constitution warranting dismissal

of the charges against him." *Pettway I*, 470 S.W.3d at 707.  We discuss why the

Kentucky Supreme Court declined to grant him relief on this issue as it is relevant

to this RCr 11.42 appeal.

> As Pettway's argument at least implicitly
> concedes, he has no grounds on which to claim that the
> trial court's actions regarding the discovery violations by
> the Commonwealth below were error.  The court granted
> his motion for a mistrial as a result of the first violation.
> Similarly, the trial court acted well within its discretion
> in declining to dismiss with prejudice the charges against

Pettway following the second delayed disclosure. And the trial court ordered appropriate relief by excluding the belatedly disclosed evidence (potentially subject to a missing evidence instruction) when Pettway, going against the advice of trial counsel to seek a continuance, chose to proceed to trial despite the delayed disclosure. He, therefore, received all the relief to which he was entitled under Criminal Rules 7.24 and 7.26 and has no cause to complain further. *See* RCr 7.24(9).

Nevertheless, Pettway claims this extraordinary remedy is justified to cure the prosecution's allegedly arbitrary actions in inadvertently failing to timely turn over discovery materials (which, incidentally, have not been shown to contain any exculpatory evidence). Ironically, this would require the Court itself to act arbitrarily. Pettway has already received appropriate judicial remedies in the form of a mistrial and exclusion of evidence. To pile on [by granting him the relief to have this Court dismiss his indictment with prejudice to remedy the two discovery violations] would be nothing but arbitrary. And such action would raise significant separation-of-powers concerns. While we acknowledge the observation of Chief Justice Palmore that "[s]ometimes, as Holmes remarked, because the constable blundered the criminal must go free, that being the most effective method of helping the constable not to blunder the next time," *Reid v. Cowan*, 502 S.W.2d 41, 42 (Ky. 1973), this is not one of those times. There was no blunder that could not be appropriately addressed, as the trial court did here, under our rules of procedure. This claim has no merit.

*Pettway I*, 470 S.W.3d at 711-12.

After Pettway learned of another discovery violation, which came to light during the trial of his codefendant, Pettway filed a motion for a new trial. The relevant facts as to that discovery violation are as follows:

-4-

In a separate trial, Dejuan Hammond was also convicted of Sheckles'[s] murder. One of the witnesses who testified at [Pettway's] trial was Dejuan Hammond's girlfriend, Princess Bolin. Bolin had told police that she was at Shelby Park with a friend when Sheckles was killed and that she had seen [Pettway] commit the crime. When asked at [Pettway's] trial to repeat what she had seen, Bolin balked. The incriminating assertion was then presented to the jury through the prior statement she had given to the police.

During the appeal of [Pettway's] conviction to this Court, his attorney received notice from the prosecutors that Bolin had made a different, and previously undisclosed, pre-trial statement to police detective Roy Stalvey. The failure to make a more timely disclosure of Bolin's other statement appears to have been inadvertent. It was uncovered during the subsequent trial of codefendant Dejuan Hammond.

In that statement, contrary to what was presented at [Pettway's] trial, Bolin denied knowing anything about Sheckles'[s] murder. [Bolin] told Detective Stalvey that she was with Dejuan Hammond buying shoes at the Jefferson Mall when Sheckles was murdered. Although this belatedly-disclosed statement provides an alibi for Dejuan, it does not exonerate [Pettway]. Nevertheless, it would have been a useful impeachment tool for undermining the trial testimony that Bolin saw [Pettway] shoot Sheckles. The Commonwealth conceded that [Pettway] should have received the report of the statement prior to his trial.

*Pettway v. Commonwealth*, No. 2016-SC-000392-TG, 2017 WL 2591813, at *1-2

(Ky. Jun. 15, 2017) (*Pettway II*) (unpublished) (footnotes omitted).

On appeal, the Kentucky Supreme Court explained its decision to decline to give Pettway relief as follows, quoting extensively from the trial court's decision and agreeing with its assessment:

> While the Court agrees this evidence may have provided [Pettway] with another avenue to impeach the statements of Princess Bolin regarding the crime, that statement only provided an alibi for Dejuan Hammond, and was not supported by other witnesses or information in the case. The newly discovered evidence contains information very remote from the issues related to [Pettway].
>
> To any observer of [Pettway's] trial, Princess Bolin was already a witness frustratingly rife with a plethora of contradictions. Kayonia Thomas'[s] testimony [which was to the effect that she saw Pettway and Hammond driving near Shelby Park at the time of the shooting] was not related to the investigative letter, and she could not realistically be impeached with one of Princess Bolin's out of court statements. The Court not only finds that the new evidence here was not likely to change the outcome of the trial, but for the above reasons, would not have made any significant difference in the trial of this case. There was a substantial amount of information involved in this trial. Given the totality of the other evidence presented, as well as the already inconsistent nature of Bolin's testimony, the Court does not find the information would have changed the outcome of the jury's decision to convict [Pettway] on the one count of murder.

Trial Court's Nov. 20, 2015, Order, pgs 5-7.

> We agree with the trial court's assessment. The substance of Bolin's undisclosed statements provided

Dejuan Hammond with an alibi for the shooting, but it did not exculpate [Pettway]. It would have aided [Pettway's] effort to impeach Bolin's other statement, but as the trial court noted, she had already been shown to be an uncooperative, contradictory, and inconsistent witness. Given the level of impeachment material already available to discredit Bolin, this new information would have been only marginally helpful.

Moreover, since Sheckles was apparently killed to prevent her from testifying against Lloyd Hammond, the credibility of Bolin's initial disclaimer of any knowledge about the shooting is burdened by the appearance that she was falsely distancing herself from the crime to avoid a similar fate. The exculpatory effect of the statement would no doubt be blunted by the Commonwealth's ability to point out Bolin's incentive to deny knowledge of the murder.

In summary, we agree with the trial court that [Pettway] is not entitled to a new trial under the applicable standard for obtaining relief under RCr 10.02 in that the new information was not "of such decisive value or force that it would with reasonable certainty" have changed the verdict, or "would probably change the result if a new trial should be granted." *Jennings* [*v. Commonwealth*], 380 S.W.2d [284,] 285-86 [(Ky. 1964)].

For similar reasons, [Pettway] is not entitled to relief under a *Brady v. Maryland*[, 373 U.S. 83, 83 S.Ct. 1194, 410 L.Ed.2d 215 (1963),] analysis. The evidence satisfies the first two prongs of the *Strickler v. Greene*[, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999),] test because it was useful to discredit Bolin and was erroneously withheld; nevertheless, [Pettway] fails to satisfy the third prong of the inquiry as he was not substantially prejudiced by the Commonwealth's failure to timely turn over the Bolin interview information.

> *Goben* [*v. Commonwealth*], 503 S.W.3d [890,] 914 [(Ky. 2016)].

2017 WL 2591813, at *3-4.

In 2018, Pettway filed a motion to vacate, set aside, or correct his sentence pursuant to RCr 11.42, raising several issues.[1] Pettway argued he was entitled to a new trial because the Commonwealth wrongfully withheld material exculpatory evidence. Pettway also argued he received ineffective assistance of counsel where counsel: (1) failed to investigate and present evidence of Pettway's alibi defense at trial; (2) directed him not to testify at trial; (3) failed to obtain exculpatory discoverable evidence from the prosecution; and (4) failed to confront and impeach witness Dontez Hurt with his prior inconsistent statements. Pettway requested an evidentiary hearing and a new trial.

The trial court summarily denied Pettway's motion and Pettway appealed.

To be entitled to the extraordinary relief of RCr 11.42, Pettway must establish he was deprived of his constitutional right to counsel. *Brown v. Commonwealth*, 253 S.W.3d 490, 500 (Ky. 2008). Under *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), Pettway must show his counsel's performance was incompetent and prejudiced

---

[1] We only discuss the arguments below that Pettway continues to argue on appeal.

him because it fell below an objective standard of reasonableness and there is a reasonable probability that the result of his jury trial would have been different but for counsel's errors.

"A perfect trial is never required. What is required is a fair trial." *Stanford v. Commonwealth*, 854 S.W.2d 742, 748 (Ky. 1993). "[T]he question should be absent counsel's errors, would the factfinder have had a reasonable doubt respecting guilt?" *Brown*, 253 S.W.3d at 499. "[T]he threshold issue is not whether [appellant]'s attorney was inadequate; rather, it is whether he was **so *manifestly* ineffective that defeat was snatched from the hands of probable victory**." *Cherry v. Commonwealth*, 545 S.W.3d 318, 323 (Ky.App. 2018) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (bold emphasis added in *Cherry*)). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *Commonwealth v. Bussell*, 226 S.W.3d 96, 103 (Ky. 2007) (quoting *Morrow*, 977 F.2d at 229).

In making such a determination, we acknowledge that "a verdict or conclusion which has little evidentiary support is more likely to have been affected by counsel's error than a verdict which is supported by substantial evidence." *Brown*, 253 S.W.3d at 499-500. Conversely, a verdict with substantial support absent counsel's errors would make it difficult for a defendant to satisfy "the

burden of showing that the decision reached would have been reasonably likely to be in his favor absent the errors." *Id.* at 500.

"[T]o be entitled to relief under RCr 11.42, the movant must 'state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds.' RCr 11.42(2)." *Roach v. Commonwealth*, 384 S.W.3d 131, 140 (Ky. 2012). If this specificity requirement is not satisfied, summary dismissal is appropriate. *Id.*

RCr 11.42(5) only requires a hearing "[i]f the answer raises a material issue of fact that cannot be determined on the face of the record[.]" *See Parrish v. Commonwealth*, 272 S.W.3d 161, 166 (Ky. 2008). "The trial judge may not simply disbelieve factual allegations in the absence of evidence in the record refuting them." *Fraser v. Commonwealth*, 59 S.W.3d 448, 452-53 (Ky. 2001).

Accordingly, "[i]f the record refutes the claims of error, there is no need for an evidentiary hearing. A hearing is also unnecessary where the allegations, even if true, would not be sufficient to invalidate the conviction." *Bowling v. Commonwealth*, 981 S.W.2d 545, 549 (Ky. 1998) (citations omitted). "Where the record is clear that an ineffective assistance of counsel claim would ultimately fail the prejudice prong of *Strickland*, regardless of the outcome of a hearing on the deficiency prong, the trial court should be affirmed even in the

absence of such a hearing." *Haley v. Commonwealth*, 586 S.W.3d 744, 751 (Ky.App. 2019).

Pettway argues that he is entitled to a new trial based on discovery violations. However, relief on this argument is foreclosed based on law of the case given the legal rulings the Kentucky Supreme Court made in *Pettway I* and *Pettway II*.

In *Pettway I*, Pettway argued he was entitled to have his charges dismissed based on the delayed receipt of discovery on two matters. The Kentucky Supreme Court determined that Pettway received all the relief he was entitled to in *Pettway I* where the first delayed disclosure resulted in the granting of a mistrial and the second delayed disclosure resulted in the exclusion of the belatedly disclosed evidence from trial. 470 S.W.3d at 711-12.

In *Pettway II*, Pettway argued he was entitled to a new trial because the Commonwealth denied him exculpatory evidence in violation of *Brady* by failing to produce Bolin's first statement to police in which she denied seeing the shooting take place. The Kentucky Supreme Court determined that while this was a *Brady* violation, it was harmless. 2017 WL 2591813, at *4.

Under the law-of-the-case doctrine, we are bound by the prior decisions of the Kentucky Supreme Court in this case and "the legal questions thus determined by the appellate court will not be differently determined on a

subsequent appeal in the same case." *Inman v. Inman*, 648 S.W.2d 847, 849 (Ky. 1982). As the *Pettway I* and *Pettway II* decisions "settled the matter[,]" as to whether discovery violations entitled Pettway to any relief, those resolutions are conclusive and established the law of the case, so these claimed errors "cannot be relitigated." *Gossett v. Commonwealth*, 441 S.W.2d 117, 119 (Ky. 1969).

Pettway argues he should have been granted an evidentiary hearing on his alibi defense as he raised an issue of fact that cannot be resolved from the record. We disagree.

Pettway failed to plead with specificity that the witnesses he named are available to be called, would be willing to testify, and to what they would testify. Besides naming his mother, brother, and girlfriend (none of them by name) and stating they would testify he was home on the evening of the murder, Pettway has provided no other specifics or other supporting evidence such as affidavits from these persons. Instead, it appears that Pettway is generally asserting what he hopes their testimony would be, without making any effort to establish if this is correct or not. This is insufficient specificity.

Additionally, in regard to each witness, record evidence suggested those witnesses would not provide an alibi and/or would be problematic if they did testify. As to Pettway's brother, Eric Pettway's testimony at trial highlights several potential problems with his possible testimony as an alibi witness. Eric

testified he was Pettway's "oldest brother;" Pettway only lived with him for about a month and a half in 2008; and Eric continued to live in Frankfort in 2009. During 2009, the year when the shooting took place, Eric testified he only saw Pettway twice, once in Frankfort and once in Louisville. Eric clarified that the first visit in 2009 was when Pettway "came down once with his brother."

This testimony indicates that Pettway has at least two brothers if not more. If Pettway was stating that Eric could act as an alibi witness, Eric's testimony seems to refute this fact as according to Eric's own testimony he did not live with Pettway and his mother, and had only seen Pettway twice in 2009, only once in Louisville. If Pettway is attempting to reference another brother as his alibi, Pettway has not been specific enough in identifying who this is.

As to Pettway's mother, Denise Pettway, as was discussed at trial in a bench conference during Pettway's aunt's testimony, Denise was schizophrenic.[2] As testified to by Pettway's aunt, Pettway was unable to live with his mother all the time due to her "special problems" and in 2008 lived with his father, his oldest brother, the aunt's mother, and then in 2009 was living with his mother part of the time and in a foster home part of the time. Therefore, there is nothing to clarify

---

[2] This is backed up by investigative reports, particularly that of Pettway's grandmother, who the detective reported stated that Denise has schizophrenia, had been recently institutionalized for treatment when she did not take her medicine, and that Pettway had not been able to live with his mother because of her condition and was supposed to be living with a foster mother. While this report is hearsay, Pettway has not disputed that his mother has schizophrenia.

whether Pettway was living with his mother at the time the shooting took place. If Pettway were living with his mother on the day of the shooting, it is unclear whether she would have been sufficiently stable at that time to accurately observe his presence; whether if she testified she would be sufficiently stable to testify well; her veracity and credibility could be questioned based on her condition; and there were additional indications that she would not be the best witness for him based on the knowledge she had regarding Pettway's illegal activities and relationship with Hammond.[3]

In considering Pettway's girlfriend's possible testimony, given Pettway's bald general assertions as to what she would testify to without him offering any evidentiary support such as an affidavit, we believe it is appropriate to consider evidence from the police investigative report in which Pettway's girlfriend's statements were recorded.[4] The contents of the report suggest that she

---

[3] In the investigative report of the interview with Denise, there were further indications about her mental instability, but she also had a lot of information about Pettway's relationship with Hammond, including Pettway's selling drugs he got from Hammond, how Pettway would do things for Hammond in exchange for getting Pettway high, and that Pettway's loyalty to Hammond was such that he "once took a drug charge for Doo Wop's girlfriend . . . for cocaine." While this information may not have been admissible, had Denise testified consistently with this report, it seems likely that Pettway would not have been painted in the best light.

[4] The Commonwealth attached investigative reports of Denise and Pettway's girlfriend to its appellate brief. Pettway argues in his reply that these reports should not be considered because they were not part of the record. He is incorrect, they are located in the discovery Redweld that is contained in the record, just as the Commonwealth noted. While these reports are hearsay, Pettway does not dispute the accuracy of his mother's and his girlfriend's statements as contained therein or argue we should not consider them because they are inadmissible hearsay.

would not be a helpful witness for Pettway, much less establish the alibi he claims. According to the summary of her statements, Pettway was supposed to be living with a foster mother but instead Pettway and the girlfriend lived together near but not with Pettway's mother; this contradicts Pettway's assertion that his mother, brother, and girlfriend were jointly home with him on the day of the shooting. Pettway's girlfriend also stated that although she was with Pettway part of the day of the shooting, she was not with him between 4:00 p.m. and 9:00 p.m. This was significant as based on eyewitness testimony to the murder, it was believed to have taken place at around 7:30 p.m.[5]

Given the lack of specificity and the problems with their potential testimony that we have identified, Pettway has failed to establish that his brother, mother, or girlfriend would provide him with an alibi or be effective witnesses. Furthermore, during the eight-day trial there was eyewitness testimony linking Pettway to the crime as well as extensive testimony that Pettway admitted to committing the murder. We believe that it is unlikely that alibi testimony, without

_____

[5] In the interview with Pettway's girlfriend, which was a summary of an audio recording the police made of it, she stated she and Pettway lived in a house to the right of his mother's house that Hammond had rented for Pettway. She made statements about witnessing Hammond and Pettway selling crack many times and noted that Pettway usually carries a red bandana hanging out of his back pocket (this was significant as witnesses identified the shooter as wearing a red bandana over his face as a mask). She also stated she was with Pettway on the day of the shooting but last saw him at 3:00-4:00 p.m., when he left with Hammond; she next saw him at Hammond's house after Hammond picked her up at around 9:00 p.m. Pettway's girlfriend admitted to seeing Pettway with a handgun several times and stated she broke up with him when he pointed a handgun at her and threatened to kill her.

any objective proof that Pettway was home during the murder, would be persuasive to the jury under these circumstances. *Compare with Wilson v. Cowan*, 578 F.2d 166, 168 (6th Cir. 1978) (explaining "that under the facts of this case, counsel's failure to call an alibi witness who was ready and willing to testify, when coupled with arguably less egregious errors, did deprive appellant of effective assistance of counsel."). Therefore, Pettway cannot establish that failure to investigate or call his mother, brother, or girlfriend as witnesses would satisfy the prejudice prong of *Strickland*, especially given the strong evidence against him.

Pettway argues he was denied the right to testify, the decision of whether or not to testify was his decision to make, and this argument requires an evidentiary hearing as it cannot be refuted by the record. While we agree that the decision as to whether to testify belongs to the defendant, we disagree that Pettway has established that there is a factual dispute on this issue that requires an evidentiary hearing.

As is noted in *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987), "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." The right of a defendant to testify on his own behalf is established by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Section 11 of the Kentucky Constitution, and KRS 421.225. *Quarels v.*

*Commonwealth*, 142 S.W.3d 73, 79 (Ky. 2004); *Crawley v. Commonwealth*, 107 S.W.3d 197, 199 (Ky. 2003). This right cannot be waived by counsel and any waiver by the defendant must be knowing and intelligent. *Riley v. Commonwealth*, 91 S.W.3d 560, 562 (Ky. 2002).

We agree with the Sixth Circuit's analysis of this issue as set out in *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000), and *Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009), as it is consistent with the analysis of Kentucky's then highest Court regarding the availability of a writ of *coram nobis* in *Kinder v. Commonwealth*, 269 S.W.2d 212, 213-14 (Ky. 1954).[6]

*Webber* explains that a defendant who wishes to testify despite counsel's advice to the contrary must alert the court to his desire to testify or disagreement with counsel's advice. *Webber*, 208 F.3d at 551. "When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct." *Id.*

---

[6] This analysis has also been adopted by our Court in *Baker v. Commonwealth*, No. 2013-CA-000256-MR, 2014 WL 2040163, at *3 (Ky.App. May 16, 2014) (unpublished). *See also Robinson v. Commonwealth*, No. 2013-CA-000509-MR, 2015 WL 3826210, at *3 (Ky.App. Jun. 19, 2015) (unpublished) (referencing *Webber* for the presumption regarding waiver of the right to testify).

*Hodge* explains that in reviewing an ineffective assistance of counsel claim regarding the denial of the right to testify, the reviewing court presumes: (1) the defendant "waived his right to testify unless the record contains evidence indicating otherwise" and (2) "trial counsel adhered to the requirements of professional conduct and left the final decision about whether to testify with the client." *Hodge*, 579 F.3d at 639. "[The defendant's] present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify." *Id.*

Similarly, under the writ of *coram nobis*, relief did not lie for a defendant's claim that counsel denied him the right to testify when counsel advised the defendant not to testify because the defendant was presumed to have acted on the advice of counsel. *Kinder*, 269 S.W.2d at 213-14. As explained therein, the Court proclaimed:

> [W]e shall not permit the attempted use of this extraordinary writ to be perverted to allow an accused to act on the advice of his counsel, and take his chance before a jury, and then when convicted, claim that he was denied his constitutional right to testify. Should we recognize such a claim, then in every criminal case the accused could merely not testify and, after conviction, claim he did not know he had the right to testify, and apply to the court for a writ of coram nobis. We will not sanction such a procedure.

*Id.* at 214.

-18-

We presume Pettway was following the advice of defense counsel not to testify because he made no effort to alert the trial court to his wish to testify. Pettway has presented nothing to counter the presumption that he chose not to testify. He is bound by his previous decision and does not get a "redo" because he is dissatisfied with the results of his trial.

Additionally, this claim lacks specificity because Pettway does not explain how counsel denied him of his right to testify. He ambiguously states that trial counsel directed him not to testify and that he wanted to testify and would have done so "had his counsel not told him he could not testify." Pettway does not allege that he was unaware of his right to testify, told his counsel he wanted to testify but was told that this was counsel's decision rather than his, or that counsel did something to prevent him from asking the trial court to let him testify. The evidence suggests that Pettway knew he had the right to testify based on him being present during jury selection when his counsel stated that Pettway may or may not take the stand. The evidence also suggests that he was willing to act against the advice of counsel when he believed the situation warranted it. *See Pettway I*, 470 S.W.3d at 711 (explaining Pettway went against the advice of counsel in choosing to proceed to trial rather than seek a continuance due to a delayed discovery disclosure).

As for what he wanted to testify about, Pettway only states that if he had testified, he would have been able to explain to the jury that he was not involved in the murder and "was at home on the day of the crime, with his mother, brother and girlfriend." As we have already discussed, there is no reason to believe that Pettway's mother, brother, and girlfriend would testify to this fact; therefore it would be Pettway's testimony alone available to establish he was home.

Pettway also had a credibility problem which would not be aided if he took the stand and had been confronted with his admissions to other witnesses about committing the murder and his own problematic statements to the police when he was interviewed.[7] Given these problems, and the substantial evidence which supported the jury's finding that Pettway murdered Sheckles, Pettway's testifying that he was not involved would be unlikely to persuade the jury.

---

[7] We acknowledge, again, that the statements relayed in these investigative reports are hearsay. However, at minimum, these statements could have been used to impeach Pettway's potential testimony.

In the first interview when confronted about being Sheckles's shooter, Pettway denied knowing anything about her or a murder in Shelby Park, laughed when he denied shooting her, said he had not heard about it, but then contradicted his lack of knowledge when he said he had heard the shooter was wearing a mask and no one knew who he was. According to the detective, when he asked Pettway where he was the day of the murder "he sarcastically said that he could not remember. He then laughed." When the detective told Pettway that Hammond was locked up and would be telling on him about Pettway's committing the murder, the detective noted Pettway said "[Hammond's] my brother and he won't say sh*t."

Additionally, if his counsel believed that by testifying Pettway would be lying, his counsel would have faced "trying to balance the client's constitutional rights [to testify, to counsel, and to a fair trial] and the duty to keep the client's confidences with the duty of candor to the court." *Brown v. Commonwealth*, 226 S.W.3d 74, 78 (Ky. 2007). "When a lawyer determines that her client is about to offer false testimony, all sources agree that the lawyer should first seek to persuade the client that such evidence should not be offered." *Id.* at 79. "There is no constitutional or permissible right of a defendant to testify falsely. When defense counsel attempts to persuade a defendant to testify truthfully, counsel is not depriving the defendant of his right to counsel nor the right to testify truthfully." *Id.* at 83 (quoting *Commonwealth v. Mitchell*, 438 Mass. 535, 551, 781 N.E.2d 1237, 1250 (2003)). If this is what occurred and counsel's discussion with Pettway resulted in Pettway's deciding not to testify, this would be an appropriate action rather than ineffective assistance of counsel, as counsel would have avoided the various pitfalls present in such a situation as set out in *Brown*. *Id.* at 79-85.

Pettway argues that his defense counsel was ineffective for failing to discover that the Commonwealth was committing discovery violations and not obtaining such information earlier. To the extent that Pettway attempts to recast the arguments he made regarding discovery delays in his direct appeal, *Pettway I*, and the *Brady* violation regarding the failure to disclose Bolin's previous statement

at all in the appeal of the denial of the motion for new trial, *Pettway II*, into a claim of ineffective assistance of counsel, because there was no prejudice as established in his prior appeals, he cannot receive relief for them now. This is because "[t]he 'reasonable probability' standard of *Strickland* is the same 'reasonable probability' standard used to prove a *Brady* violation, *viz.*, a 'probability sufficient to undermine confidence in the outcome.'" *Bussell*, 226 S.W.3d at 103 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

While we understand Pettway's frustration with the outcome of those proceedings, Pettway cannot have another bite at the apple where the Kentucky Supreme Court, while acknowledging the withholding of this material was in error, determined he either received appropriate relief or the error was harmless. Therefore, while we can consider whether Pettway's counsel was ineffective because counsel should have known that this evidence was being withheld and failed to act on such knowledge to discover this omitted material, even if Pettway's counsel erred, the error cannot satisfy the second prong of *Strickland* where any error was not prejudicial.

Pettway argues that his counsel was ineffective for never impeaching Hurt with inconsistencies from his prior statement to police and states he was prejudiced because "[i]f trial counsel would have effectively cross-examined Mr.

Hurt, his testimony, credibility, and identification of Steven Pettway would have been destroyed." We disagree.

Pettway states that Hurt told the jury he was able to identify Pettway because his mask came off during the incident, and Pettway pointed the gun at Hurt, looked him in the face, and then pointed back at Sheckles. Pettway claims this testimony was inconsistent with Hurt's prior statement in which he said the shooter had a mask on, never mentioned it coming off, said the shooter had dreadlocks, focused the entire time on Sheckles, and never pointed the gun at Hurt.

Typically, the method of how to cross-examine a witness is a tactical decision which will not be second-guessed in an RCr 11.42 proceeding. *Hodge v. Commonwealth*, 116 S.W.3d 463, 473 (Ky. 2003), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151, 159 (Ky. 2009). Furthermore, the video record from the trial shows that counsel did vigorously cross-examine Hurt and repeatedly had him read his prior inconsistent statements.[8] This included inconsistencies about what the shooter looked like as presented at trial when compared with his previous description including that the shooter had "dreads" or braids, was about his size (Hurt was far taller than Pettway, as

---

[8] Pettway failed to cite to where in the record Hurt's previous statements could be found despite the requirement in Kentucky Rule of Civil Procedure (CR) 76.12(4)(c)(v) which states that the argument must have "ample supportive references to the record and citations of authority pertinent to each issue of law[.]" The only portions of Hurt's prior statement that we have found are those which Hurt read during cross-examination at trial, as part of Pettway's counsel's impeachment with prior inconsistent statements.

established by Pettway's family members testifying that at the time of the shooting he was a small, skinny guy, only reaching the shoulder of his five-foot-six-inch tall aunt, and always had short hair), and having his face concealed by a bandana. Counsel also had Hurt read his prior statements that the shooter had never aimed at him. Therefore, everything Pettway complains was insufficiently raised in cross-examination was in fact raised, thereby refuting his claim.

Additionally, Hurt was able to reconcile some of his statements on redirect. He explained that while in his initial interview he reported the shooter had braids or dreads, he did not actually see braids or dreads, but because the sweatshirt hood that the shooter was wearing puffed out, he assumed that meant the shooter had braids or dreads. He demonstrated with a tissue that what he meant by the shooter's bandana coming down was that the shooter's face was uncovered to just below his top lip, but that it was still on the shooter's face. Therefore, coming down did not mean coming off. Hurt also clarified that when he was interviewed right after the shooter appeared that he was still under shock from seeing Sheckles shot and the unsuccessful attempts to save her through CPR; he had passed out from this event and he was not as coherent or clear about what had happened at the time as he was later.

Although Hurt agreed he had not previously identified Pettway as the shooter prior to trial, he said this was because he did not know Pettway at the time

of the shooting but put it all together when he saw him. While Pettway's counsel diligently tried to discredit Hurt's identification of Pettway as the shooter, Hurt remained steadfast on this key point.

As noted in *Stanford*, 854 S.W.2d at 748, "[a]fter every trial, win or lose, candid lawyers can think of ways they might have done better. A perfect trial is never required. What is required is a fair trial." While, perhaps, an even better cross-examination of Hurt could have taken place, Pettway was not deprived of his right to counsel from the skilled cross-examination that did take place. Additionally, there is no showing of prejudice as there is no reason to believe that a better cross-examination would have resulted in Hurt stating he was mistaken in his identification of Pettway, or in the jury disbelieving him. Therefore, a summary denial on this issue was appropriate.

In summation, we are confident that there are no material issues of fact raised by adequate allegations that cannot be conclusively resolved by an examination of the record. Additionally, we believe that Pettway was not prejudiced in any event. *See Moore v. Commonwealth*, 983 S.W.2d 479, 484 (Ky. 1998) (discussing how "in light of all of the evidence presented at trial," the jury would have to disbelieve several witnesses and, therefore, the Court believed that a failure to impeach one witness's testimony and a failure to present testimony from another witness "did not alter the entire evidentiary picture in [a]ppellant's trial.").

Therefore, an evidentiary hearing was not required, and the trial court acted appropriately.

Accordingly, we affirm the Jefferson Circuit Court's summary denial of Pettway's motion for RCr 11.42 relief.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Michael Lawrence Goodwin
Louisville, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General
Frankfort, Kentucky