RENDERED: FEBRUARY 4, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0973-MR

CONRAI ANDRE KABALLAH                                          APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE BARRY WILLETT, JUDGE
ACTION NO. 11-CR-002821

COMMONWEALTH OF KENTUCKY                                       APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: DIXON, McNEILL, AND K. THOMPSON, JUDGES.

DIXON, JUDGE: Conrai Andre Kaballah appeals the denial of his RCr[1] 11.42

motion to vacate the judgment of his conviction, entered by the Jefferson Circuit

Court on June 9, 2020. After careful review of the record, the briefs, and the law,

we affirm.

---

[1] Kentucky Rules of Criminal Procedure.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

On August 6, 2008, Takeisha Huff and Marion Jones were shot and killed in their apartment in Louisville's Sheppard Square housing complex. Huff was shot twice and Jones once. In the area surrounding the apartment, police recovered a handgun–consistent with that used to shoot Huff–containing two spent rounds, as well as a bloodied white shirt, a baseball cap, and a cigarette butt. The following day, police recovered a second handgun–consistent with that used to shoot Jones–containing one spent round. That same day, police interviewed Marcus Whitehead who reported hearing gunshots and then witnessing two black males exit the apartment, one of whom removed his white shirt, using it to wipe a handgun he was holding. At trial, despite police asserting that Whitehead's identity had been verified, Whitehead denied making the statement or witnessing the described events. The substance of his prior statement to police was introduced through direct examination as impeachment evidence.

On June 9, 2009, police interviewed Carl Bruce. Pursuant to the written report of the interview, Bruce stated he had been walking in the Sheppard Square complex on August 6, 2008, when he heard gunshots. Bruce then observed two black males, holding handguns and wearing white shirts, exit the apartment. Bruce described to police the route he observed the men take, and the interviewing detective confirmed that it was consistent with where the guns, the shirt, and the

baseball cap were recovered.  Bruce indicated that later the same night, he saw the men again and noted that one of the men had removed his shirt.  Bruce stated that he observed the men get in a car driven by a third man.  The man who removed his shirt was known by Bruce as either Anthony or Compton, the second man as Jerry Taylor, and the driver as Derrick Hargrove.  At trial, Bruce denied any memory of these events or of giving the statement, which was introduced as impeachment evidence.

In 2011, Kaballah's DNA was matched to samples recovered from blood stains on the shirt, as well as from swabs taken from the inside collar of the shirt and inside the cap.  The shirt tested positive for gunshot residue (GSR).  When police interviewed Kaballah, he denied knowing the victims, Taylor, or Hargrove; denied being involved in the murders; and denied being known as Compton, despite the word "Compton" being tattooed on his neck.

Over the span of the eight-day jury trial in March 2015, the Commonwealth called 28 witnesses and entered 103 exhibits during the guilt phase.  Kaballah did not testify and called only one witness, Lacora Chambers, who testified that Taylor had confessed that he and Hargrove committed the murders.  Kaballah was convicted of two counts of murder and of tampering with physical evidence.  He was sentenced to life without the possibility of parole for 25 years on each count of murder and five years for tampering.  His conviction was

affirmed on direct appeal.  *Kaballah v. Commonwealth*, No. 2015-SC-000491-MR, 2017 WL 635567, *2 (Ky. Feb. 16, 2017).

In 2019, Kaballah filed a motion to vacate, set aside, or correct sentence pursuant to RCr 11.42, which he later supplemented with the assistance of counsel.  An evidentiary hearing was held on November 21, 2019, wherein he and his trial counsel testified.  On June 9, 2020, the Jefferson Circuit Court denied the motion, and this appeal timely followed.  Additional facts will be introduced as they become relevant.

## ANALYSIS

Ineffective assistance of counsel claims are evaluated under the two-prong standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as adopted by the Supreme Court of Kentucky in *Gall v. Commonwealth*, 702 S.W.2d 37 (Ky. 1985).  To be successful, the movant first must show that counsel's performance was deficient and that said deficiency prejudiced the defense.  *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  Counsel's performance is deficient if he made errors so serious as to not function as the "counsel" guaranteed by the Sixth Amendment.  *Id.*

To establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694, 104 S. Ct. at 2068.  "The

likelihood of a different result must be substantial, not just conceivable."

*Commonwealth v. Pridham*, 394 S.W.3d 867, 876 (Ky. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011)). "No conclusion of prejudice . . . can be supported by mere speculation." *Jackson v. Commonwealth*, 20 S.W.3d 906, 908 (Ky. 2000) (citations omitted).

> Mere speculation as to how other counsel might have performed either better or differently without any indication of what favorable facts would have resulted is not sufficient. Conjecture that a different strategy might have proved beneficial is also not sufficient. *Baze* [*v. Commonwealth*, 23 S.W.3d 619 (Ky. 2000)]; *Harper v. Commonwealth*, 978 S.W.2d 311 ([Ky.] 1998). As noted by *Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) (*en banc*): "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."

*Hodge v. Commonwealth*, 116 S.W.3d 463, 470 (Ky. 2003), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009).

"[B]oth parts of the *Strickland* test for ineffective assistance of counsel involve mixed questions of law and fact[.]" *Brown v. Commonwealth*, 253 S.W.3d 490, 500 (Ky. 2008). Unless clearly erroneous, "[we] must defer to the determination of facts and credibility made by the trial court." *Id*. (citing *McQueen v. Commonwealth*, 721 S.W.2d 694, 698 (Ky. 1986)). We review *de novo* "counsel's performance and any potential deficiency caused by counsel's performance." *Id.*

-5-

## ANALYSIS

Kaballah's first argument on appeal is that trial counsel was ineffective by failing to investigate and present an alibi witness and alternative perpetrators.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. Regarding counsel's trial decisions, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S. Ct. at 2066. "Judicial review of the performance of defense counsel must be very deferential to counsel and to the circumstances under which they are required to operate. There is always a strong presumption that the conduct of counsel falls within the wide range of reasonable professional assistance because hindsight is always perfect." *Hodge*, 116 S.W.3d at 469 (citing *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)). With these principles in mind, we turn to Kaballah's specific claims.

We first address Kaballah's claim that trial counsel failed to investigate alibi evidence where (1) counsel did not interview Paula Brown who, as

-6-

part of Kaballah's RCr 11.42 motion, attested that Kaballah visited her on a regular basis in August 2008, and (2) counsel did not pursue security camera footage from Brown's apartment. At the evidentiary hearing, trial counsel and Kaballah gave conflicting testimony regarding whether Kaballah identified Brown as a potential witness prior to trial. The court found trial counsel to be more credible and denied Kaballah's claim.

Due regard must be given to the court's credibility determinations. CR[2] 52.01. As such, trial counsel cannot be deficient for failing to investigate a witness of whom he had no reason to be aware. Further, Kaballah has not met his burden of proof where he failed to establish beyond mere speculation that he had a credible alibi. At the evidentiary hearing, Kaballah did not call Brown as a witness, did not produce the security footage–or even establish that it existed–and did not establish that he was with Brown during the relevant time.

Turning to alternative perpetrators, Kaballah is critical of trial counsel's handling of three individuals–Anthony Lee Clay, Derrick Hargrove, and Joseph Thompson–whom he asserts should have been presented to the jury as alternative perpetrators. We will address each in turn.

Clay was interviewed by police two days after the murder and disclosed that he had previously dated Huff, that his sisters had multiple physical

---

[2] Kentucky Rules of Civil Procedure.

altercations with her, and that two months before the murders, following a fraught drug deal with Huff, Clay was stabbed in the face by Jones. Kaballah argues trial counsel was ineffective by failing to introduce this evidence.

At the evidentiary hearing, trial counsel testified that he fully reviewed the extensive case file, including Clay's interview, prior to making strategic decisions. Trial counsel agreed that Clay had a motive but denied that there was anything actually linking him to the crime. While he could not recall specifically why he did not introduce this evidence, trial counsel opined that conflicting theories were detrimental to the defense's credibility and asserted his strategy was to focus on Hargrove as the alternative perpetrator. It was further noted that Clay had an alibi–his girlfriend. The trial court denied Kaballah's claim finding that trial counsel had made a strategic decision in choosing not to pursue this evidence. We agree.

Herein, trial counsel indicated he conducted a thorough review, calculated that a single alternative perpetrator strategy was more credible, and pursued that strategy effectively during trial by making the jury aware of Hargrove's potential ties to the murders. As Kaballah concedes in his brief, Hargrove–a known associate of Taylor, whom police believed to be the other shooter–was a credible alternative perpetrator. There were witness statements to support this theory, and unlike Clay, Hargrove did not have a known alibi.

Consequently, we cannot say that trial counsel was deficient. Further, given the DNA evidence connecting Kaballah to the shooting, as well as the eyewitness identification corroborated by his "Compton" tattoo, we cannot say that the introduction of evidence of a possible alternative perpetrator would have changed the result.

Next, as detailed above, Hargrove was identified as an alternative perpetrator during the trial. While Kaballah concedes the jury was aware of Hargrove, he argues trial counsel was deficient by failing to interview Hargrove or call him as a witness. Trial counsel admits he never had any substantive conversations with Hargrove, nor did he pursue him as a witness. In explanation, trial counsel expressed skeptism that Hargrove would have implicated himself on the stand and opined that Hargrove's absence created greater doubt in the jury's mind.

We agree with the trial court that this claim lacks merit. Kaballah offered no evidence that Hargrove could or would have provided testimony at trial that would have been beneficial to the defense. Thus, the alleged prejudice is wholly speculative, and we need not reach the question of whether trial counsel was deficient in this regard.

Finally, with regard to Thompson, a cigarette butt with his DNA was found outside the building where the shooting occurred. Thompson testified

briefly at trial, explaining that he resided with his girlfriend, Brittany Dixon, in Sheppard's Square in 2008, that he was a frequent smoker whose cigarette butts were likely all over the area, and that he routinely parked near where the cigarette butt was recovered. Kaballah asserts Dixon, who did not testify, gave conflicting accounts to police regarding Thompson's whereabouts on the night of the shooting. In her first statement made August 7, 2008, Dixon indicated she was in the house and heard gunshots, with no mention of Thompson. In her second statement made August 24, 2012, Dixon stated she and Thompson were awakened by sirens. Kaballah also notes that Thompson knew details of the murder (*i.e.*, that there was a murder and rumors regarding the motive) when he was questioned by police in 2012.

Kaballah argues counsel was deficient by failing to pursue Thompson as an alternative perpetrator by confronting him and his girlfriend with her inconsistent statements. At the evidentiary hearing, trial counsel was skeptical that Thompson was a viable alternative perpetrator; consequently, he did not believe Thompson's girlfriend would be a beneficial witness.

Again, we agree with the trial court that this claim fails. As detailed above, trial counsel made a reasoned and strategic decision to pursue a single theory of defense which supports not pursuing this line of inquiry. Further, given the comparatively tangential evidence implicating Thompson, we cannot say that

-10-

counsel's decision was unreasonable. Therefore, Kaballah has failed to prove his counsel's representation was deficient. Moreover, given the much stronger evidence against Kaballah, he has failed to demonstrate prejudice.

Kaballah's second argument is that trial counsel was ineffective by failing to retain any defense expert witnesses and thereby allowing the expert testimony to come solely through the Commonwealth's six expert witnesses. He argues the Commonwealth's monopoly on the interpretation of the physical evidence prejudiced the jury, as evidenced by the jury posing multiple questions regarding the forensic evidence. Additionally, Kaballah asserts that the failure of counsel to retain an expert resulted in a lay witness giving unqualified testimony regarding GSR testing.

Kaballah has cited no support for his premise that counsel is *per se* deficient for not retaining experts, regardless of need, and we soundly reject his assertion. In explaining the lack of defense experts, trial counsel testified he was able to get what he needed during cross-examination of the Commonwealth's experts. Kaballah admits that the Commonwealth's experts offered only a tenuous, speculative connection between him, the physical evidence, and the murders; and that trial counsel elicited favorable testimony regarding the effects of the delay in testing, the ease of contamination of the evidence, and the ephemeral, unreliable nature of GSR during cross-examination. Kaballah has not identified what expert

-11-

trial counsel should have retained or the substance of any such expert testimony. Therefore, we cannot say that trial counsel was ineffective.

In his third claim of error, Kaballah argues trial counsel was ineffective by failing to object to prejudicial testimony from Sergeant Heacock. Heacock, a witness for the Commonwealth, was called to establish that Kaballah, through a fellow inmate, had tampered with a witness in the case. On direct examination, in response to a request to describe the layout of the area of the jail where Kaballah was housed, Heacock testified that, "[t]he inmates in that dorm are usually in there for disciplinary reasons or admin. seg. [administrative segregation], they can't be housed in general population, so they're in their cell for twenty-three hours a day, they come out for one." Trial counsel did not object and did not seek an admonition.

At the evidentiary hearing, trial counsel recalled that he was unable to object before the testimony was offered because the question itself was not objectionable, and that afterwards he did not want to draw more attention to the unfavorable testimony by objecting. We conclude that trial counsel's decision falls within the wide range of reasonable professional assistance. Further, while the testimony was certainly prejudicial, given the evidence against Kaballah, coupled with the fact the jury was already aware that Kaballah had been incarcerated, we

do not believe that, but for the brief, general reference to disciplinary/ administrative housing, the result of the trial would have been different.

Kaballah's fourth claim is that trial counsel was ineffective by failing to introduce mitigating evidence that he was raised by a single mother and that he sustained multiple injuries, including traumatic brain injuries. Trial counsel was not questioned at the evidentiary hearing regarding his mitigation investigation or his decisions regarding penalty phase witnesses. Additionally, Kaballah did not present any proof establishing that the alleged mitigating evidence existed and was admissible. Accordingly, Kaballah's assertion of ineffective assistance of counsel is nothing more than pure speculation.

Kaballah's fifth claim of error is that trial counsel was ineffective by failing to impeach Bruce. At trial, during cross-examination, Bruce denied being a drug addict, seeing things that were not there, and being diagnosed as paranoid. Six days later, during the defense's case-in-chief, trial counsel attempted to introduce as impeachment evidence video of Bruce's prior competency hearing; however, because it was not offered contemporaneously with Bruce's testimony, the trial court excluded the evidence. The Supreme Court of Kentucky affirmed the denial, albeit on different grounds. *Kaballah*, 2017 WL 635567, at *2. Kaballah asserts he was prejudiced because, as the only witness who placed Compton at the scene, Bruce's credibility was pivotal.

-13-

We disagree that Kaballah was prejudiced by trial counsel's actions. Bruce's trial testimony was mostly non-responsive and erratic. He repeatedly asserted that he could not remember anything with regard to the case and stated several times he could not remember things from more than a few days prior. Specifically, he could not remember being in the apartment complex the night of the murders, giving a statement to police on two occasions, or even his own mental health and criminal history. He denied knowing anyone connected to the case. On cross-examination, he acknowledged being a drug user. He stated that he had been using drugs since he was young, that he was probably using drugs in 2008 when the murders occurred, that he had a pending case for violating an emergency protection order, and that there was a motion for him to be examined by a psychologist. Thus, the jury was amply aware of the potential credibility issues regarding Bruce's testimony, and the introduction of largely redundant testimony was unlikely to have changed the result of these proceedings.

Kaballah's final claim is that trial counsel's cumulative errors resulted in effective assistance of counsel. Given the facts of this case, and our analysis as set forth above, we disagree.

## CONCLUSION

Therefore, and for the foregoing reasons, the order entered by the Jefferson Circuit Court is affirmed.

-14-

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| J. Ryan Chailland<br>Frankfort, Kentucky | Daniel Cameron<br>Attorney General of Kentucky<br>Frankfort, Kentucky |
| | Thomas A. Van De Rostyne<br>Assistant Attorney General<br>Frankfort, Kentucky |